MAYO FOUNDATION v. COMMISSIONER OF REVENUE.

236 N. W. 2d 767.

October 17, 1975—Nos. 45304, 45308.

*Dorsey, Marquart, Windhorst, West & Halladay, Robert J. Johnson, John W. Windhorst, Jr.,* and *Kenneth L. Cutler,* for Mayo Foundation.

*Warren Spannaus,* Attorney. General, *C. H. Luther,* Deputy Attorney General, and *Arthur J. Glassman,* Special Assistant Attorney General, for commissioner of revenue.

SHERAN, CHIEF JUSTICE.

Two writs of certiorari to review a decision of the Tax Court imposing sales and use tax liability on the Mayo Clinic for the period from August 1, 1967, to December 31, 1968; imposing such liability on the so-called "post-merger" Mayo Foundation for the period from March 1, 1969, to April 30, 1969; and holding the so-called "pre-merger" Mayo Foundation exempt from such taxes during the period from August 1, 1967, to December 31, 1968.[1] For the reasons stated herein, that portion of the Tax Court's decision imposing tax liability on the Mayo Clinic and "post-merger" Mayo Foundation is reversed. That portion of the Tax Court's decision holding the "pre-merger" Foundation exempt from taxation is affirmed.

Minn. St. c. 297A levies a tax on all retail sales occurring within Minnesota as well as a tax on the usage, storage, or consumption of personal property within the state. Minn. St. 1969, § 297A.25, subd. 1(n),[2] provided for a specific exemption from the sales and use tax for personal property purchased or used by an institution "organized and operated exclusively for charitable, religious or educational purposes." The state has sought to impose sales and use tax liability on the Mayo Clinic

---

[1] Prior to February 28, 1969, the Mayo Foundation and the Mayo Clinic were separate and distinct entities. On February 28, 1969, the Mayo Clinic merged into the Mayo Foundation, with the post-merger Foundation continuing all the functions of the pre-merger entities. The clinical practice of medicine continues to be conducted under the name "Mayo Clinic."

[2] Now part of Minn. St. 297A.25, subd. 1(p).

and "pre-merger" Mayo Foundation for the 1967 and 1968 tax periods and on the "post-merger" Mayo Foundation for March and April 1969. Essential to the determination of whether the Mayo entities are exclusively charitable or educational institutions are an analysis of their historical development and an examination of their current functions and activities.

Dr. William Worrall Mayo and his two sons, Dr. William James Mayo and Dr. Charles Horace Mayo, conducted a private medical practice in Rochester, Minnesota, during the 1880's. As the number of patients coming to the three Mayos increased, it became necessary to add other physicians to the practice. The work of the Mayo group became widely known and other physicians began to refer to the group as the "Mayo Clinic." This name came into general use around 1903.

In 1919, Dr. William J. Mayo and Dr. Charles Mayo formed an organization called the Mayo Properties Association.[3] They endowed the Association with 2.2 million dollars in cash and securities and all of the physical assets of their medical partnership, as well as their medical records, library, specimen collections, and the right to use the name "Mayo Clinic." The purpose of the Mayo Foundation as expressed in its articles of incorporation is—

"* * * to aid and advance the study and investigation of human ailments and injuries, and the causes, prevention, relief and cure thereof, and the study and investigation of problems of hygiene, health and public welfare, and the promotion of medical, surgical and scientific learning, skill, education and investigation, to conduct, and engage in the conduct of programs of medical education and to offer programs of graduate education and instruction in all fields of medicine, surgery and related scientific study, and, in the broadest sense, to engage in and con-

[3] In 1947, the Mayo Properties Association was renamed the Mayo Association and in 1964 it was renamed the Mayo Foundation. Hereinafter the Association will be referred to as the Mayo Foundation.

duct and to aid and assist in medical, surgical and scientific education and research * * *."

The Mayo Foundation is currently organized and operated under the Minnesota Nonprofit Corporation Act, Minn. St. c. 317, for the purpose of advancing medical education and research.

The present Mayo Clinic was formally organized in 1936 as an association for the practice of medicine and for the conducting of medical and scientific research and education. It was formed as an outgrowth of the various medical partnerships that had practiced under the name Mayo Clinic since the early 1900's. The objective of the Mayo Clinic was stated in its articles of associa- tion to be—

"* * * service to humanity, in its broadest sense, and not the material advancement or enrichment of the individual, and that only such part of the earnings of the Clinic as is necessary rea- sonably to compensate them for services should inure to the mem- bers thereof, and that the rest of the earnings should be used for the benefit of the public, from whom it came in the past and through whom it must come in the future, through better care of the sick, medical education for better trained doctors, re- search and the general welfare of the public."

The Mayo Graduate School of Medicine was created in 1915 as a means by which the activities of the Mayo Clinic staff in medical education and research could become associated with the Graduate School of the University of Minnesota. The Mayo Graduate School of Medicine offers advanced training for young physicians who have completed medical school and a period of internship. Graduate degrees may be awarded by the University of Minnesota upon completion of the specialized programs. The cost of operating the Mayo Graduate School is borne almost en- tirely by the Mayo Foundation. The only other financial support comes from training grants and from the income of a trust fund established by the Mayo brothers and the Mayo Foundation. The faculty of the graduate school is composed of members of the

Mayo Clinic staff, approximately 95 percent of whom receive academic appointments from the University of Minnesota. Mayo Clinic staff members receive no additional compensation for serving on the graduate school faculty. During the years 1967 to 1969, the graduate school had an enrollment of approximately 700 residents in 37 medical and surgical specialties and basic medical sciences, making the Mayo Graduate School the largest graduate school of medicine in the world. None of the residents pay tuition and each receives a stipend from the Mayo Foundation. During the years 1967 to 1969, the Mayo Foundation expended between 4.2 and 6.2 million dollars per year for the direct costs of the graduate school. If the expense allocable to the "teaching time" of faculty members was added, the Foundation's total expenditure would approach 9 million dollars per year.

From 1936 until the merger of the Mayo Clinic into the Mayo Foundation, the Mayo Foundation leased all of its medical properties and assets to the Mayo Clinic. Under the lease agreement, the rental fee payable to the Mayo Foundation consisted of the entire income of the Mayo Clinic after payment of its operating expenses. To insure that no part of Clinic income could be diverted to private benefit, the Foundation was empowered to regulate Clinic expenses, including the salaries and fringe benefits of the Clinic staff. During the years 1967 and 1968, the Clinic had net income of 9.5 million dollars and 11.5 million which it paid to the Mayo Foundation. This rental fee represented the principal source of income of the Mayo Foundation. Other income, consisting of investment securities, real estate investments, housing projects, and research grants, amounted to 7.2 million dollars in 1967 and 6.2 million in 1968. The net worth of the Mayo Foundation was 101 million dollars in 1967 and 105.8 million in 1968.

Approximately 525 physicians, surgeons, and medical scientists comprised the professional staff of the Mayo institutions during the 1967-1969 period. Each staff member receives a fixed annual salary and fringe benefits such as life, accident, and dis-

ability insurance, a retirement pension, and free medical care. The salaries paid to Mayo staff members are comparable to those of physicians in private practice. No staff member is permitted to maintain a medical practice separate from that of the Mayo institutions and no staff member receives any additional compensation for participation in research or educational programs. If a staff member receives compensation from a third party for appearing at seminars, colloquia, etc., it must be turned over to the Mayo institutions unless the staff member elects to charge the absence against annual leave time.

During each of the years 1967, 1968, and 1969, there were in excess of 200,000 patient registrations, 25,000 surgical operations, and close to 100,000 general examinations at the Mayo institutions. More than one-half of the registrants were Minnesotans. Basic medical and surgical fees are established in light of various factors, including prevailing levels of fees established by other medical centers and by individual practitioners in the area, fee schedules promulgated by various medical groups and insurance companies, cost-accounting studies, time devoted to the patient, the value of services rendered to the patient, and the cost of equipment and materials used in treatment of the patient. It is the stated policy of the Mayo institutions to offer medical care regardless of the financial circumstances of the patient. Thus, a financial interview is not necessary prior to examination and arrangements for fee payment may be made upon consultation with Mayo credit counselors. Fee charges are adjusted as necessary so that they will not constitute an unreasonable burden on the financial capabilities of the individual. In 1967, 1968, and 1969, medical fees were reduced due to patients' financial circumstances in the amounts of $732,440, $849,012, and $844,000.

The Mayo institutions have provided extensive medical care for patients at Rochester State Hospital since the 1890's. Individual Mayo staff members serve as directors of various programs at the hospital, and nearly 100 Mayo residents per year are assigned full time or part time to the hospital. No charge is

made by the Mayo institutions for these services. In addition, the Mayo staff provides surgical treatment for patients at other state hospitals and at state penal institutions. Again, no charge is made for these services.

During the 1967-1969 period, the Mayo Foundation made net expenditures of approximately 4.5 million dollars per year for medical research. About 20 to 30 staff members were engaged in full-time research, while another 125 staff members were engaged in research on a part-time basis. The results of Mayo research are made available to the public through general dissemination to the medical profession. Any patents resulting from Mayo research are assigned to an independent nonprofit corporation which issues manufacturing and processing licenses for the development of the patented article. The Mayo institutions retain no proprietary interest in the patented articles.

Prior to 1969, the Mayo Foundation and Mayo Clinic were exempt from Federal income taxes pursuant to § 501(c)(3) of the Internal Revenue Code as entities operated exclusively for charitable, educational, or scientific purposes. The post-merger Foundation continues to be tax-exempt. The Foundation and Clinic are also exempt from state income taxes pursuant to Minn. St. 290.05(9). Finally, certain portions of the medical buildings owned by the Mayo Foundation are exempt from real property taxation under Minn. St. 272.02. The Foundation has claimed exemption on only that portion of the buildings used exclusively for education and research purposes.

On appeal two issues are presented for review: First, whether the Mayo entities are exempt from sales and use taxes on purchases of tangible personal property in 1967, 1968, and 1969, as institutions of purely public charity within the meaning of former Minn. Const. art. 9, § 1,[4] or as institutions organized and

---

[4] Prior to the November 3, 1970, amendment, former Minn. Const. art. 9, § 1, read, in pertinent part: "Taxes shall be uniform upon the same class of subjects, and shall be levied and collected for public purposes, but public burying grounds, public school houses, public hospitals,

operated exclusively for charitable or educational purposes within the meaning of Minn. St. 1969, § 297A.25, subd. 1(n);[5] and second, if not all purchases by the Mayo entities are exempt, whether the purchases of equipment designed for and used in diagnosis of human illness, injury, and disease are excluded from taxation under Minn. St. 1969, § 297A.25, subd. 1(b).[6] Because we hold each of the Mayo entities exempt from all sales and use tax liability, we do not reach the issue of exemption for specific types of purchases.

While entitlement to exemption under Minn. St. 1969, § 297A.25, subd. 1(n), has not been considered by this court, the same question has been presented in numerous cases concerning exemption from ad valorem real property and personal property

---

academies, colleges, universities, and all seminaries of learning, all churches, church property and houses of worship, institutions of purely public charity, and public property used exclusively for any public purpose, shall be exempt from taxation * * *." The comparable provision in the constitution adopted November 5, 1974, is art. 10, § 1.

[5] Minn. St. 1969, § 297A.25, subd. 1(n), provided: "The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44:

\* \* \* \* \*

"(n) The gross receipts from the sale of tangible personal property to, and the storage, use or other consumption of such property by, any corporation, society, association, foundation, or institution organized and operated exclusively for charitable, religious or educational purposes."

[6] Minn. St. 1969, § 297A.25, subd. 1(b), provided: "The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44:

\* \* \* \* \*

"(b) The gross receipts from the sale of prescribed drugs and medicine intended for use, internal or external, in the cure, mitigation, treatment or prevention of illness or disease in human beings and products consumed by humans for the preservation of health, including prescription glasses, therapeutic and prosthetic devices, but not including cosmetics or toilet articles notwithstanding the presence of medicinal ingredients therein."

taxes. Inasmuch as the language found in the statutes granting these exemptions is nearly identical to the language employed in the exemption provision of the sales and use tax statute, the reasoning and principles of our prior cases are important to the resolution of the instant case.

Perhaps the most frequently made statement in our charitable exemption cases is that exemption depends on the particular facts of each case and the burden of proof rests with the petitioner seeking the exemption. See, e. g., In re Junior Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 135 N. W. 2d 881 (1965) ; Madonna Towers v. Commr. of Taxation, 283 Minn. 111, 167 N. W. 2d 712 (1969). As a concomitant of this necessary emphasis on factual analysis, we have not adopted a single, all-purpose definition of "charity" or "charitable institution." Our most recent definition is found in In re Junior Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 390, 135 N. W. 2d 881, 885:

"The legal meaning of the word 'charity' has a broader significance than in common speech and has been expanded in numerous decisions. Charity is broadly defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons 'by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.' "

While we acknowledge the difficulty of fashioning a definition that will serve in all situations, we approve of this definition as an indication of our concept of the term "charity."[7]

---

[7] Compare this definition with the Internal Revenue regulation adopted under 26 USCA, § 501(c)(3): "The term 'charitable' is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the

In North Star Research Institute v. County of Hennepin, 306 Minn. 1, 5, 236 N. W. 2d 754, 756 (1975), which also deals with charitable exemption from taxation, this summary of our earlier decisions appears:

"For the most part, the decisions of this court have dealt with organizations which were engaged in charitable undertakings in the traditional sense—care for the sick, the aged, and the infirm; education of young people; hospital care for the poor; facilities to promote the moral and educational welfare of youth; institutions for religious education. In these cases, assessment has been made of such factors as (1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the 'charity' are required to pay for the assistance received in whole or in part; (4) whether the income received from gifts and donations and charges to users produces

broad outlines of 'charity' as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; * * * lessening of the burdens of Government; * * *." 26 CFR § 1.501(c)(3)-1(d)(2).

See, also, the Minnesota regulations of 1969 and 1974 issued under the sales and use tax statutes, and providing in part: "Charitable organizations shall include those organizations organized and conducted exclusively for the purpose of rendering aid, comfort and assistance to the indigent and defective, open to the public generally, conducted without a view to profit, and supported and maintained by benevolent contributions." Sales & Use Tax Reg. 66 (1969).

"Charitable defined. 'Charitable' is used in its generally accepted legal sense and includes relief of the poor, under-privileged, distressed and defective, the care of the sick, the infirm or the aged; erection or maintenance of public buildings and monuments; lessening of the burdens of government; lessening of neighborhood tensions; elimination of prejudice and discrimination; defense of human and civil rights secured by law; and combating of community deterioration and juvenile delinquency." Sales and Use Tax Reg. 415(b) (1974).

a profit to the charitable institution; (5) whether the beneficiaries of the 'charity' are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

"The tendency of our decisions has been to sustain exemption where these traditionally 'charitable' objectives are being furthered, so long as no individual profits from ownership of the 'charity' are realized and so long as the undertaking is not a subterfuge by which the needs of a select and favored few are accommodated.

\* \* \* \* \*

"In all of these situations except those involving religious education, where constitutional limitations apply, the activity involved is one which our state and Federal governments have historically supported with public funds. Government programs for relief of poverty, care for the sick and aged, and the education and training of young people have been long and widely accepted."

The commissioner has read our decisions as establishing seven prerequisites for granting an organization tax-exempt status as a charitable institution: (1) It must be organized and operated for the purpose of rendering aid, comfort, and assistance to the sick and indigent (for which he cites County of Hennepin v. Brotherhood of Gethsemane, 27 Minn. 460, 8 N. W. 595 [1881]); (2) it must be conducted without a view to profit (for which he cites State v. Bishop Seabury Mission, 90 Minn. 92, 95 N. W. 882 [1903]); (3) it must be supported and maintained in part by benevolent contributions (for which he cities In re Junior Achievement of Greater Minneapolis, Inc. *supra*, and In re Claim of Assembly Homes, Inc. v. Yellow Medicine County, 273 Minn. 197, 140 N. W. 2d 336 [1966]); (4) it must be open to the public generally without restriction (for which he cites State v. Evans Scholars Foundation, 278 Minn. 74, 153 N. W.

2d 148 [1967]) ; (5) it must be operated so as to lessen the burdens of government (for which he cites Camping & Education Foundation v. State, 282 Minn. 245, 164 N. W. 2d 369 [1969]); (6) it must be organized and operated so that its charitable aids reach an indefinite number of people (for which he cites Madonna Towers v. Commr. of Taxation, *supra*); (7) it must be so organized and operated that its commercial activities are subordinate to or incidental to any possible charitable activities (for which he cites Camping & Education Foundation v. State, *supra*).

The factors identified by the commissioner are comparable to those set forth in the North Star Research case, and we agree that they are appropriate for the consideration of charitable status. However, the significant difference between the approach advocated by the commissioner and the one which we adopt lies in our view of the weight to be given to the individual factors. The general language of our definitional statements and the identification of factors in our prior cases are only guides for analysis. Each case must be decided on its own particular facts and it is not essential that every factor mentioned in our decisions be present before an institution qualifies for exemption.

Applying the elements discussed in North Star Research and advanced by the commissioner to the facts of the case at bar, we are of the opinion that the pre-merger Mayo Foundation, pre-merger Mayo Clinic, and post-merger Mayo Foundation were charitable or educational institutions for the relevant tax periods. First, the Mayo entities are engaged in charitable activities in the traditional and strict sense. Care of the sick, medical research, and medical education are favored undertakings which have been deemed worthy of official encouragement, and our state and Federal governments have historically supported such undertakings with public funds. The Mayo institutions are extensively involved in programs which lessen the burdens of government, such as care of state hospital residents and state prison inmates. Second, the stated purpose of the Mayo

institutions has always been "service to humanity, in its broadest sense, and not the material advancement or enrichment of the individual." The Mayo institutions have carried out this purpose through the treatment of patients, training of medical personnel, and contributions to medical research and knowledge without the expectation or receipt of material reward. Third, the Mayo Foundation received its original endowment by gift from the Mayo brothers, and the Foundation and Clinic have continued to receive private contributions, as well as substantial grants, from the state and Federal governments. Fourth, while patients at the Mayo Clinic are charged standard fees for medical services, it is the policy of the Mayo institutions to offer medical care regardless of the financial circumstances of the patient. Ability to pay does not affect the nature of care rendered and substantial discounts in medical charges are made each year so that the cost of treatment will not constitute an unreasonable burden on any individual. Moreover, the recipients of the Mayo institutions' research and education programs, the public at large, and the fellows of the Mayo Graduate School, do not pay for the benefits they receive. Fifth, the Mayo Foundation experienced an increase in net worth during the tax periods in question of approximately 4 to 6 percent per year. There is no indication that medical charges were established with a view toward generating a profit for the Foundation, and the modest increase in the Foundation's net worth appears consistent with its goals of providing high-quality medical care and advancing medical education and research. Sixth, there are no restrictions placed on those receiving medical services from the Mayo Clinic. A financial interview is not necessary prior to examination and the Clinic is open to all. The results of Mayo research are widely disseminated and the Foundation retains no proprietary interest in patents it develops. Admission to the Mayo Graduate School is limited as to number and requires extensive preparatory education. However, these restrictions on the class of person to whom the "charity" is made available bear a reasonable relation-

ship to the "charitable" objective. Seventh, the Mayo Foundation is organized and operated so that its assets will never be available to private interests. The staff members of the Mayo entities receive fixed annual salaries, comparable to the average salaries of the medical profession and not dependent on or linked to the fees which they generate. They receive no additional bonuses or dividends.

Finally, even if the Mayo entities engage in commercial activities, they are incidental to their charitable activities. The commissioner contends that the Mayo Clinic is not exclusively charitable because it is engaged in the private practice of medicine. In the instant case that practice appears to be incidental to the educational and research activities of the Mayo entities The quality of a clinical education program depends, to a large extent, on the availability of a large and diverse patient population to provide exposure to various medical problems and situations. Similarly, the Mayo research program depends on a large patient population in order to function successfully. Thus, patient care at the Mayo Clinic is inextricably interwoven with the educational and research functions of the Mayo entities.

We therefore conclude that the Mayo Foundation and Mayo Clinic have satisfied their burden of showing entitlement to exemption. That portion of the Tax Court's decision denying exemption to the pre-merger Mayo Clinic and post-merger Mayo Foundation is accordingly reversed. That portion of the Tax Court's decision granting exemption to the pre-merger Mayo Foundation is affirmed.

Reversed in part; affirmed in part.

MR. JUSTICE TODD took no part in the consideration or decision of this case.