**WORTHINGTON DORMITORY, INCORPORATED, n.k.a.k.a. Worthington College Foundation, Incorporated, Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

**No. 50019.**

Supreme Court of Minnesota.

April 11, 1980.

Brecht, Hedeen & Hughes, and Joel C. Wiltrout, Worthington, for relator.

Warren Spannaus, Atty. Gen., and Thomas K. Overton, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard before KELLY, YETKA and WAHL, JJ., and considered and decided by the court en banc.

YETKA, Justice.

This case concerns the application of Worthington Dormitory, Inc., now known as Worthington College Foundation, Inc., ("the Foundation") for a certificate of exempt status from sales and use tax pursuant to Minn.Stat. § 297A.25, subd. 1(p) (1978). On October 27, 1975, the Commissioner of Revenue denied the Foundation's application and assessed sales and use taxes, interest and penalties totaling $7,786.77. The Tax Court, in an order dated August 4, 1978, affirmed the commissioner's conclusion that the Foundation is not exempt from sales and use tax, but canceled all penalties assessed by the commissioner. The Tax Court further denied the Foundation's motion for amended conclusions of law in an order dated February 13, 1979. This court granted the Foundation's petition for a writ of certiorari. We reverse.

The sole issue in this case is whether the Foundation is exempt from sales and use tax as an institution organized and operated exclusively for charitable, religious or educational purposes within the meaning of Minn.Stat. § 297A.25, subd. 1(p) (1978).

The resolution of this issue is dependent upon an understanding of why and how the Foundation was formed. Worthington Junior College was founded in 1936 as a division of the Worthington School District. The state took over the management of the college in 1964, and the name of the college was eventually changed to Worthington Community College. The peak enrollment at the college was 750 students in 1970, 95% of whom came from within a 60-mile radius surrounding the college and 40% of whom needed housing in Worthington.

In the late 1960's, it came to the attention of college officials and Worthington citizens that many students were living in substandard housing. Most student housing was found in private homes, including some in attics and basements without bathing facilities. The college first sought state funding to construct a dormitory, which the state refused, at least in part because community

colleges are designed to be non-residential. Therefore, a group of Worthington community members decided to solve the problem themselves. The group consulted students and also traveled around the state to study both exterior and interior designs for dormitory units.

The group's decision was that mobile homes provided the most cost-effective way of providing adequate housing to students. Each mobile home was designed to house four students and has overall dimensions of $14' \times 56'$. The design was such as to allow four single beds, separate study desks, two full baths and a central living room and kitchen.

To finance this project, the group formed a non-profit corporation with the stated purpose of constructing, operating and maintaining a housing facility for rental to students attending Worthington Community College. The corporation was originally called Worthington Dormitory, Inc., and changed in 1972 to Worthington College Foundation, Inc. The $340,000 sum needed to purchase the homes was 100% financed by 8% loans from each of the three Worthington lending institutions. Seventy-three individual Worthington citizens signed as guarantors for these loans, each one guaranteeing $6,400.

Land adjacent to the college was purchased at below-market cost from the Worthington School District. Forty-eight homes were arranged on the land in 12 groups of four with the help of many individual volunteers. There are three other units in "Star Student Village": a manager's residence, a combination laundry and office, and a chapel/meeting place donated by the Worthington churches. The entire on-site electrical primary system was installed at no cost by the City of Worthington.

To live at Star Student Village, a person must be taking at least one college credit. Occasionally some college-related personnel have lived in the village, and former stu-dents may be allowed to remain at the village during the summer following their graduation. The residents of the village must pay a $40 damage deposit plus a monthly rental. The rent began in 1970 at $49.95 per month, was raised to $55 by 1975, and was $65 at the time of the hearing. Needy students may qualify for one of the 16 scholarships given by the Foundation, which are in effect a one-third reduction of the rent charged. The state provided evidence that two-bedroom units could be rented in Worthington for $175 to $220 in 1975. However, a brochure for Star Student Village states that the cost of dormitories at state residential facilities at approximately the same time ranged from $80 to $87 per month.

The Foundation has never shown a profit. The Foundation employs a married couple to manage the village, plus a summer crew to repair and maintain the units. The directors receive no compensation nor can they according to the Articles of Incorporation. Upon dissolution, any profits are to become the property of Worthington School District or such other non-profit organization designated by the school district. The Foundation's chief source of income is from rents, but the Foundation also receives an average of $10,000 per year in charitable contributions. Many of these contributions come from Mr. James Vance, the president of the Foundation and moving force behind the project. The Foundation also gives contributions to the college, supervises a student government at the village, and aids in the publication of a student newspaper called the "Star Village Voice."

The Foundation is exempt from both federal and state income taxes. In a prior case, the Nobles County District Court held the Foundation to be an institution of purely public charity and exempt from real estate taxation.[1]

The chief issue in this appeal is whether the Foundation is a corporation organized and operated exclusively for charitable or

1. The appellant does not contend that principles of collateral estoppel bind the state to the findings and conclusions of this 1972 district court decision. The state was not a party to that action and claimed at oral argument to have received no notice of the action.

educational purposes within the meaning of the following statute:

> The following are specifically exempted from the taxes imposed by sections 297A.01 to 297A.44:
>
> \*   \*   \*   \*   \*   \*
>
> (p) The gross receipts from the sale of tangible personal property to, and the storage, use or other consumption of such property by, any corporation, society, association, foundation, or institution organized and operated exclusively for charitable, religious or educational purposes if the property purchased is to be used in the performance of charitable, religious or educational functions, or any senior citizen group organized and operated exclusively for pleasure, recreation and other nonprofit purposes, no part of the net earnings of which inures to the benefit of any private shareholders \*   \*.

Minn.Stat. § 297A.25, subd. 1(p) (1978).

■ The charitable exemption cases all agree that taxation is the general rule and exemption the exception. *Mayo Foundation v. Commissioner of Revenue*, 306 Minn. 25, 236 N.W.2d 767 (1975); *Camping and Education Foundation v. State*, 282 Minn. 245, 164 N.W.2d 369 (1969). The burden to prove entitlement to the exemption rests with the party seeking the exemption. *Id.* Each case must be decided upon analysis of its own unique facts, however. *Mayo Foundation v. Commissioner of Revenue*, 306 Minn. at 36, 236 N.W.2d at 773.

To aid in the analysis of the facts of each case, this court has articulated six factors to be considered in determining whether a charitable exemption is appropriate. These factors are:

> (1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part; (4) whether the income received from gifts and donations and charges to users

produces a profit to the charitable institution; (5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

*North Star Research Institute v. County of Hennepin*, 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975). In the *North Star* case we applied these factors in the context of personal property taxes, but in *Rio Vista* we used the factors in regard to real estate taxes, and in *Mayo Foundation* we used them in regard to sales and use taxes, which are the subject of the present appeal.

In this case, the commissioner concedes that the Foundation meets factors one, four, and six. The stated purpose of the Foundation is to provide housing to students at Worthington Community College on a non-profit basis. The Foundation has not made a profit in any year since its inception in 1970. The directors do not receive dividends or any other form of compensation. Any profit which should remain upon dissolution will not go to private interests, but rather to the Worthington School District or its non-profit designee.

The commissioner argues, however, that the Foundation does not meet factors three and five and meets factor two only marginally at best. In regard to factor two, the tax court found that donations and contributions account for between 10 and 17% of the Foundation's annual income. The commissioner argues that an average of 13.4% donations per year is too little to satisfy factor two and that most of the donations should not be considered because they came from the president of the Foundation.

It appears obvious that contributions made by the president are true contributions. The president does not receive compensation for his work nor will he receive any proceeds from any future dissolution of the corporation. The contributions of the

president of this Foundation must be considered as part of donations made to the Foundation.

While 10–17% donations sounds like a small amount, $10,000 per year to be raised in a town the size of Worthington is not. There are, in addition, many subtle forms of voluntary contributions in this case. For instance, the 73 Worthington citizens who guaranteed the notes for the project have provided a contribution that is difficult to assess in dollar or percentage amounts but, nevertheless, shows real public support for the Foundation's project.

Charitable exemptions have been granted in the face of voluntary contributions much smaller than those in this case. A nursing home was held to be exempt from real estate taxation despite the fact that voluntary contributions to the home were $66 one year and $5,448.53 to a group of nursing homes the next year. *In re Validity of Claim of Assembly Homes, Inc. v. Yellow Medicine County*, 273 Minn. 197, 140 N.W.2d 336 (1966). The satisfaction of factor two requires only that an entity be supported by gifts and donations "in part," a condition which the Foundation has clearly met.

The fifth factor is whether the beneficiaries of the charity are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives. The residents of Star Student Village are restricted only insofar as they must be enrolled at Worthington Community College. That restriction is directly related to the Foundation's purpose of providing housing on a non-profit basis to students. The Foundation has not imposed any unreasonably narrow restrictions as did a student house which gave scholarships only to young men who had caddied for 2 years at a Minnesota golf club belonging to the Western Golf Association. *State v. Evans Scholars Foundation of Minnesota, Inc.*, 278 Minn. 74, 153 N.W.2d 148 (1967). The nonrestrictive policy of Star Student Village also distinguishes it from the Greek letter

fraternities and sororities generally held to be taxable. Annot., 66 A.L.R.2d 904 (1959).

The commissioner argues that providing housing for students is not charitable in and of itself and that many of the village residents are not students. Providing low-cost housing to students without a view to profit in order to promote an educational facility seems to us to be a charitable purpose. The overwhelming majority of the residents at Star Student Village are full-time students. The facts that a few college-related personnel have been allowed to live there pending their securing more permanent housing and that a few former students have lived there in the summer do not defeat the overall charitable objective of the Foundation.

The commissioner also submits that the fifth factor includes a subfactor—whether the undertaking lessens the burdens of government. *See Rio Vista Non-Profit Housing Corp. v. Ramsey County*, 277 N.W.2d 187, 191 (Minn.1979). The commissioner contends that, since the state has decided not to construct dormitories for the non-residential community college system, the Star Student Village does not lessen the burdens of government. This argument loses sight of the fact that the dormitory encourages students to attend the state-operated Worthington Community College. The dormitory certainly promotes current governmental interests in enrolling students at the college and will alleviate any future burden the state might decide to assume by building dormitories for community colleges. Given the present energy problems, the state may quite conceivably build dormitories to help students avoid the costs of commuting from rural areas to the community colleges. In addition, the Foundation's project no doubt lessens the burden of local government by reducing the need for housing code enforcement and simplifying parking and policing problems. Because the Foundation lessens the burdens of government and has restricted the class of its beneficiaries only to promote its charitable objective, factor five has been satisfied.

Factor three—whether the recipients of the charity are required to pay for the

assistance in whole or in part—is more troublesome. The record below contains evidence that in 1975 two-bedroom apartments were available in Worthington for between $175 and $220 while the students paid $55 apiece, or $220 per unit. Consequently, the tax court found that the Foundation's rates are "comparable to the rental rate for other two bedroom units in Worthington, but provide a more appropriate atmosphere for students attending Worthington Community College." The commissioner argues with some force that charging market rents to students is not a charitable activity. He relies on the statement in *Rio Vista* that:

> [R]ents actually paid by tenants [of Rio Vista] are *not* the major source of revenue to the project. This is a distinguishing feature of the Rio Vista situation: Tenants receive the housing at considerably less than market value or cost.

*Rio Vista Non-Profit Housing Corp. v. Ramsey County*, 277 N.W.2d 187, 192 (Minn. 1979) (emphasis in original).

In this case, it is obvious that students pay less than cost for the housing they receive. The rents charged have never covered the Foundation's costs of operation, and deficits have been filled by charitable contributions. It is also doubtful that the students pay "market rents." An unfurnished two-bedroom.apartment of unknown dimensions is not of comparable value to a dormitory unit which is completely furnished, has all utilities paid except telephone, has a full bath for every two people, and is in close proximity to campus. A better comparison would be the cost of state-operated dormitory facilities, which evidently charged $80 to $87 per month at a time when the Foundation charged $55. While the rents paid by the students do comprise the largest source of revenue to the Foundation, the Foundation has purposely kept the need for rental revenues to a minimum by building the facility out of relatively inexpensive mobile home units and by encouraging voluntary contributions of time and services by community members.

The case of *Camping and Education Foundation v. State*, 282 Minn. 245, 164 N.W.2d 369 (1969), on which the commissioner also relies, can be distinguished from this case. There a non-profit corporation ran a summer camp for boys which operated mainly on tuition paid by the campers, received some donations, and awarded some scholarships. The camp was held to be like a commercial venture since the bulk of its income resulted from tuition charges to campers. As an additional rationale for denying the exemption, however, this court found that the boys' camp involved was not significantly different from other camps which would be taxed.

Here, the Foundation's dormitory is not significantly different from dormitories at state and private educational institutions. It is well-settled law that such dormitories are exempt from taxation. *State v. Carleton College*, 154 Minn. 280, 191 N.W. 400 (1923). Speaking about private colleges, the court stated: "That dormitories for students are reasonably necessary for institutions like defendant is beyond doubt." *Id.*, 154 Minn. at 286, 191 N.W. at 403. The Foundation's dormitory similarly bears a direct relationship to education as contrasted with the indirect relationship of camping to education.

It is not essential that every factor mentioned in our decisions be present before an institution qualifies for exemption from taxation. *Mayo Foundation v. Commissioner of Revenue*, 306 Minn. 25, 36, 236 N.W.2d 767, 773 (1975). However, the Foundation here has met each of the six factors set out by the *North Star* decision. It has met its burden of proof by showing that it has elements of both a charitable and an educational institution. The Foundation operates a dormitory at no profit which would clearly be tax exempt if it were part of an educational institution. The educational institution here cannot build a dormitory because the state will not give it money to do so. Consequently, an entire community joined forces to provide the adequate, low-cost housing which students needed but the state would not pro-

vide. Rarely does one find a better example of community involvement than in this case. It appears basically unfair for the state, through the Commissioner of Revenue, to now demand taxes from a Foundation which benefits its own educational institution. We therefore hold that the Foundation is exempt from sales and use taxation.

We are also cognizant of the fact that the Nobles County District Court held the Foundation to be exempt from real estate taxation. We recognize that the identical test is used for exemption from sales and use tax as is used for exemption from real estate tax. We believe that the district court was correct and the tax court was not. The tax court is accordingly reversed, and the case is remanded to the tax court with directions to grant the Foundation a certificate of exemption.

Reversed.