**SHARE, Relator,**

v.

**The COMMISSIONER OF REVENUE, Respondent.**

**No. C1–84–1277.**

Supreme Court of Minnesota.

Feb. 22, 1985.

Bruce E. Hanson, Doherty, Rumble & Butler, P.A., St. Paul, for relator.

Hubert H. Humphrey III, Atty. Gen., James W. Neher, Sp. Asst. Atty. Gen., St. Paul, for respondent.

PETERSON, Justice.

SHARE, a health maintenance organization, filed for a certificate of exempt status from sales and use tax as a purely public charity under Minn.Stat. § 297A.25, subd. 1(p) (1984). SHARE claimed entitlement to the exemption because it provides non-profit health care to a cross section of the community. The Commissioner of Revenue denied the exemption, asserting that SHARE is not an institution of purely public charity, and the tax court upheld this determination. We affirm.

The matter was submitted to the trial court on stipulated facts. It appears from the record that SHARE was incorporated in August 1973 as a non-profit corporation under Minn.Stat. ch. 317 for the purpose of providing health care and has since been

operated exclusively as a health maintenance organization. SHARE is federally qualified under 42 U.S.C. § 300e, the Health Maintenance Organization Act, and has a valid Certificate of Authority under the Minnesota Health Maintenance Act of 1983, Minn.Stat. § 62D.01–.30 (1984).

In compliance with the Minnesota Health Maintenance Act, SHARE has neither capital stock nor shareholders but is instead governed by a board of directors, 40% of whom are elected by its enrollees from among its enrollees. The board has authority to manage the property, funds, affairs, and business of the corporation. SHARE complies generally with the other requirements of the Act, including establishment of a consumer affairs committee, complaint resolution system, and a method of annually disbursing information to enrollees.

SHARE owns and operates 12 medical clinics throughout the Minneapolis-St. Paul area and disburses its health care services through these clinics, primarily to individuals enrolled in its programs.[1] Enrolled individuals pay a monthly fee and, in return, receive basic health care services without limitation as to time or cost, except for nominal copayments that may be charged at the time the services are rendered. Although SHARE provides the bulk of its services to enrollees, it will provide services to non-enrollees for a fee comparable to that charged by a private medical clinic.

Each subscriber's monthly fee is determined by the particular health care plan to which the subscriber belongs. SHARE 3 is a plan offered to recipients of Aid to Families with Dependent Children, as a supplement to the health benefits provided by Medicaid, at a cost of $62.05 per month; SHARE 5 offers family coverage to members of Teamsters Local No. 120 at a monthly charge of $160 per member; SHARE 9 is offered to employees of participating companies in the Minneapolis-St. Paul area, as well as to persons joining

individually, at a cost of $60 per month for individual care, $130 for married-couple care, and $180 per month for dependent care. The highest monthly fee, $194.75, is charged to members of SeniorCare, which provides the same services and benefits covered under Part A and Part B of the Medicare program. The actual cost to SeniorCare members is only $19.75 per month, however, since the remaining $175 is paid by the Federal Health Care Financing Administration pursuant to a contract with SHARE.

SHARE normally does not provide health services without charge. SHARE did participate in a 12-week demonstration program, beginning in April 1983, in which it provided free or reduced-fee health care services one evening each week to certain unemployed individuals. The program was administered by the AFL–CIO, which screened applicants and prepared weekly appointment lists, and was restricted to individuals who had been unemployed for 6 months, had lost all medical benefits, and were not eligible for medical assistance. SHARE did not accept walk-in patients or those who did not meet the program guidelines. This program has not been repeated.

SHARE is financed primarily by user fees. In 1982, 96% of SHARE's $38,622,-490 income was generated from prepaid member fees and member copayment fees. The remaining 4% of that income was derived from investment income (2%), fees for services to non-members (1%), and other income and allowances (1%). The record does not indicate receipt of any private contributions, but SHARE has received some public funding from the United States Department of Health and Human Services (formerly known as the Department of Health, Education, and Welfare): Family Health Center grants in the amount of $1,450,000 for July 1, 1980, through June 30, 1981, and in the amount of $1,742,-032 for July 1, 1981, through December 31, 1982,[2] and in July 1976, an Operating Cost

---

1. In 1983, SHARE had approximately 75,000 enrollees.

2. These grants were awarded to SHARE to establish a health care program for the low-income population. In oral argument, SHARE

Assistance Loan in an amount not to exceed $850,000, repayable in various increments each July 1, with a final payment in 1991, at an interest rate of 8.25% per annum.

Although organized as a non-profit corporation, SHARE had a surplus of $1.8 million over its $36,292,582 operating expenses at the end of 1982. A similar surplus was realized in 1981. Nonetheless, SHARE is not authorized to distribute any profits, and SHARE's articles of incorporation require that upon dissolution its assets shall be disposed of in a manner that precludes distribution of any gain to a private interest.

SHARE had been paying sales and use taxes on its purchases, but a 1981 audit indicated an underpayment of approximately $6,000. In 1981, SHARE applied to the Commissioner of Revenue for a certificate of exempt status from sales and use tax pursuant to Minn.Stat. § 297A.25, subd. 1(p) (1984), claiming that it is a tax-exempt charity. The commissioner denied SHARE's application, and the tax court affirmed, concluding that SHARE was not an institution of purely public charity so as to qualify for tax-exempt status as provided by Minnesota law.

The sole issue in this case is whether SHARE is exempt from sales and use tax as an institution organized and operated exclusively for charitable purposes within the meaning of section 297A.25, subdivision 1(p).

■ Minnesota law provides a tax exemption for institutions of purely public charity. Minn. Const. art. 10, § 1; Minn. Stat. § 297A.25, subd. 1(p) (1984). There is no question that SHARE is liable for sales and use tax, as determined by the trial court, if it does not qualify as a purely public charity. The Internal Revenue Service and the Minnesota Department of Revenue have concluded that SHARE is a tax-exempt charity for purposes of income taxation, but those determinations are not con-

trolling on the issue before this court. *Rio Vista Non-Profit Housing Corp. v. County of Ramsey*, 277 N.W.2d 187, 189 (Minn. 1979).

■ SHARE's central contention is that a provider of non-profit health care, which is federally qualified and consequently required to provide its health care services to a cross section of the community, is entitled to a charitable exemption. Commendable as SHARE's program may be, however, it must be remembered that taxation is the rule and exemption the exception. *See e.g., Mayo Foundation v. Commissioner of Revenue*, 306 Minn. 25, 236 N.W.2d 767 (1975); *Camping & Educ. Found. v. State*, 282 Minn. 245, 164 N.W.2d 369 (1969). Having a worthwhile objective does not in itself justify classifying an institution as a "purely public charity."

■ Although an exhaustive definition of "charity" cannot be given, we have adopted the following general definition:

The legal meaning of the word "charity" has a broader significance than in common speech and has been expanded in numerous decisions. Charity is broadly defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons "by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

*Junior Achievement of Greater Minneapolis, Inc. v. State*, 271 Minn. 385, 390, 135 N.W.2d 881, 885 (1965). This court has further articulated six factors to be considered in determining whether a charitable exemption is appropriate:

(1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of materi-

---

indicated that this funding had been used to develop the SHARE 3 program, which supple-

ments Medicaid benefits at a cost to each enrollee of $62.05 per month.

al reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part; (4) whether the income received from gifts and donations and charges to users produces a profit to the charitable institution; (5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

*North Star Research Institute v. County of Hennepin,* 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975).

 The commissioner concedes that SHARE meets factors one, four, and six— one of SHARE's stated purposes is to "improve the availability and accessibility of quality of health care and health services" on a non-profit basis,[3] and SHARE's articles of incorporation provide that its assets shall be disposed of in a manner that precludes any distribution to a private interest. Satisfaction of the three factors conceded by the commissioner, however, does not in itself qualify an institution as a "purely public charity," *see, e.g., Worthington Dormitory, Inc. v. Commissioner of Revenue,* 292 N.W.2d 276, 279 (Minn.1980); *Rio Vista,* 277 N.W.2d at 190. Application of the other elements to the facts convinces us that SHARE is not a charitable institution.

First, the tax court concluded that SHARE receives no support from dona-

tions, a requirement of factor two. Although that court incorrectly refused to consider government grants as well as private contributions as support, *see, e.g., Rio Vista,* 277 N.W.2d at 191, it is uncontested that SHARE receives the bulk of its support from user fees. In fact, SHARE's 1982 income statement does not specifically list any contributions and classifies "miscellaneous" income as accounting for only 1% of total income. Even if this entire 1% is attributable to contributions, this small proportion contrasts sharply with donations received by institutions we have previously found exempt.[4] In addition, SHARE does not receive contributions every year and, in oral argument, admitted that because of this a determination of SHARE's charitable status might have to be made annually. In view of the minimal and sporadic support SHARE receives from contributions, we conclude that the second factor is not satisfied.

Moreover, SHARE fails to satisfy the fifth factor—whether the class of beneficiaries has a reasonable relationship to a charitable objective. Although the class of beneficiaries of SHARE's "charity" includes only those able to pay, SHARE contends that its provision of health care on a non-profit basis nonetheless furthers a charitable objective. As demonstrated by this court's definition of "charity," set forth in *Junior Achievement of Greater Minneapolis v. State,* 271 Minn. at 390, 135 N.W.2d at 885, this factor is intertwined with the question whether such health care lessens the burdens of government. *Rio Vista,* 277 N.W.2d at 191. Although the government clearly encourages provision of low cost, non-profit health care through

---

**3.** That SHARE experienced an increase in net worth during 1981 and 1982 does not deprive it of non-profit status.

In *Mayo Foundation,* we found an increase of 4 to 6% "consistent with [Mayo's] goals of providing high-quality medical care and advancing medical education and research," since there was no indication that medical charges had been established with a view toward generating a profit for the foundation. 306 Minn. at 37, 236 N.W.2d at 773–74. SHARE's more modest profit can be similarly justified.

**4.** *See, e.g., Worthington Dormitory,* 292 N.W.2d at 280; *Rio Vista,* 277 N.W.2d at 190. Even in *Assembly Homes, Inc. v. County of Yellow Medicine,* 273 Minn. 197, 140 N.W.2d 336 (1966), where voluntary contributions were only $66 one year and $5,448.53 in the next, a large portion of group homes' support came not from user fees, but from the government through payments by county welfare boards and the Veterans Administration.

health maintenance organizations, SHARE does not actually lessen any of the government's burdens by furnishing services to individuals who would otherwise turn to the government for such aid.[5] This is not a case of providing a service to low- and moderate-income families, as in *Rio Vista,* but, on the contrary, of provision of health care only to those able to pay a monthly fee, regardless of income. Because SHARE's subscribers are able to pay this fee, they would presumably turn not to the government but to private physicians and insurance companies were SHARE not in existence. Accordingly, we conclude that SHARE's provision of health care, as limited, does not further a charitable objective or lessen burdens on the government.

■ Finally, SHARE's charitable exemption claim is defeated by application of factor three—whether recipients of the charity are required to pay for the assistance in whole or in part. That SHARE charges fees for its services does not automatically preclude it from entitlement to a charitable exemption. We recognize that major changes in the area of health care, especially in modes of operation and financing, have necessitated changes as well in definitional predicates. The term "charitable" as applied to health care facilities has been broadened since earlier times, when it was limited mainly to almshouses for the poor. Consequently, we concluded that Mayo Clinic was entitled to an exemption as a purely public charity even though the majority of its patients are charged standard fees for medical services. In contrast to SHARE, however, the Mayo Clinic provided other services without requiring full payment. The Mayo institutions had a policy of offering medical care regardless of a patient's financial circumstances and gave substantial discounts each year so that the cost of treatment did not place an unrea-

sonable burden on any individual. SHARE has no such policy; if an individual cannot pay the full monthly fee for service, membership is discontinued. Moreover, in *Mayo Foundation,* we found that the public at large received without charge the benefits of the Mayo institutions' research and educational programs. The record indicates no comparable research or educational benefits from SHARE. Finally, Mayo Clinic provided continual free care of state hospital residents and state prison inmates; SHARE provides no service without a fee, except for a 12-week program for unemployed individuals meeting specific requirements. This represents a one-time project and contrasts sharply with Mayo's ongoing programs.

Although SHARE is like Mayo Clinic in that both provide health care, its operational scheme leads us to conclude that SHARE is more closely akin to the retirement apartment complexes involved in *Madonna Towers v. Commissioner of Taxation,* 283 Minn. 111, 167 N.W.2d 712 (1969), and *State v. United Church Homes, Inc.,* 292 Minn. 323, 195 N.W.2d 411 (1972). In those cases eligibility for services was based upon ability to pay. Although nonprofit, the basic financial plan of each project was to create a capital structure by the proceeds of membership fees. Because of this, we concluded that exemption should be denied. So too should SHARE, which has a comparable financial structure, be denied classification as a purely public charity.

■ SHARE argues that it should be distinguished from other organizations that provide service for a fee because it is federally qualified. To maintain federal qualification, SHARE argues that it must provide health care to a cross section of the community and charge fees based upon a community rating system, not upon an experi-

5. SHARE claims that its SeniorCare program lessens governmental burdens by providing health care in lieu of Medicare at a cost of "95% of the amount the Health Care Financing Ad-

ministration (HCFA) anticipates would otherwise be paid for those same benefits and services." The trial court never made this finding of

ence rating system.[6] We fail to see how the mere fact that SHARE is federally qualified entitles SHARE to an exemption. SHARE may *offer* its services to a cross section of the community, but only those able to pay its fees are eligible to receive those services. Moreover, SHARE's fees are not based upon a sliding scale, with lower fees set for those with lower incomes. Once it establishes its fees, SHARE charges all individuals under each health care plan the same amount, regardless of financial need. Simply having a mandate to provide health care to a cross section of the community does not sufficiently benefit the public at large to counteract the fact that SHARE charges a monthly fee for all services it provides.

It should be noted that we are at a disadvantage in reviewing the record before us in that it does not fully detail SHARE's complete factual posture, especially in comparison with other health care providers with which it competes. Since the parties feel that the record is adequate for a determination of the issue, we have taken them at their word. We feel, however, that the legislature, with its ability to explore all issues with respect to these health care facilities, is the appropriate body to make such a determination. Indeed, the health maintenance act states that the legislature intends to monitor such organizations, Minn.Stat. § 62D.01, subd. 2(c) (1984), and legislative consideration of this issue would be consistent with that.

■ Accordingly, we hold that, based upon the facts before us, SHARE is not a "purely public charity" and is not entitled to exemption from sales and use tax. Although providing low cost health care on a non-profit basis is certainly worth encouraging, we are unable to conclude that it satisfies the requirements of that narrow charitable exemption.

Affirmed.

fact, however. Moreover, SeniorCare is only one part of SHARE's extensive program.

6. 42 C.F.R. § 110.108(c)(2) specifically requires: "[E]ach HMO shall offer enrollment to persons

who are broadly representative of the various age, social, and income groups within its service area."