SKYLINE PRESERVATION FOUNDATION, Relator,

v.

COUNTY OF POLK, Respondent.

No. C0–00–360.

Supreme Court of Minnesota.

Feb. 8, 2001.

Eric J. Peck, Jeffrey J. McNaught, Thomas F. Pursell, Lindquist & Vennum, P.L.L.P., Minneapolis, for relator.

Wayne H. Swanson, Polk County Atty., Larry D. Orvik, Asst. Polk County Atty., Crookston, for respondent.

## OPINION

LANCASTER, Justice.

Relator Skyline Preservation Foundation, Inc. (Skyline) appeals from a Minnesota Tax Court summary judgment holding that Skyline is not an institution of purely public charity, which would exempt it from taxation under Article X of the Minnesota Constitution[1] and Minn.Stat.

---

1. Article X, § 1 of the Minnesota Constitution states, in relevant part:

   Taxes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes, but * * * institutions of purely public charity * * * shall be exempt from taxation except as provided in this section. * * * The legislature by law may define or limit the property exempt under this section * * *.

§ 272.02, subd. 1(6) (Supp.1997).[2] Under Minn.Stat. § 278.01 (2000), Skyline petitioned the tax court to review respondent Polk County's 1997 classification of Skyline's real property as nonexempt. The tax court applied the guidelines outlined by this court in *North Star Research Institute v. County of Hennepin*, 306 Minn. 1, 236 N.W.2d 754 (1975), and reasoned that an entity can only satisfy those factors ·based on actual operations and not based on future plans. Because Skyline was not at the time of the court's decision providing any services to the public, the tax court held that it failed to satisfy its burden of proving compliance with the *North Star* factors. Because we conclude that a fledgling organization is not precluded from qualifying as a purely public charity, we reverse.

The property at issue in this case is the former Cathedral of the Immaculate Conception (the cathedral) in Crookston, Minnesota, and the land on which it stands. The cathedral was constructed in 1912 by the Roman Catholic Church and served as the cathedral for the Diocese of Crookston until it was decommissioned in 1990. In 1990 the diocese conveyed the cathedral and its adjacent buildings to Care and Share, Inc. Care and Share operated a homeless shelter in the adjacent buildings, but the cathedral sat idle. In 1996, Care and Share divided its property into two parcels, separating off the cathedral, which in October of that year was deeded to Skyline.

Skyline was incorporated as a nonprofit corporation under Minn.Stat. ch. 317A (2000) in August of 1996 and is exempt from federal income taxes under section 501(c)(3) (Supp.2000) of the Internal Revenue Code. Skyline was organized for a two-phase purpose: first, to acquire the cathedral and preserve it as a landmark; and second, to develop the cathedral into a community center devoted to entertainment, recreation, and education.

The use and disposition of the property at issue is restricted by covenant and Skyline's Articles of Incorporation. The deed to the cathedral received by Skyline contains restrictive covenants that run with the property and prohibit its use for liquor sales, gambling, any medical institution, or "any purpose that conflicts with the property's prior use as * * * a Catholic Cathedral." Skyline's Articles of Incorporation require that in the event of dissolution, its remaining assets must be distributed to entities that are organized and operated exclusively for charitable, educational, religious, or scientific purposes and are exempt from federal taxes under section 501(c)(3). The Articles of Incorporation preclude Skyline's directors, officers, and members from realizing pecuniary gain through the corporation or its dissolution.

In October 1998 Skyline obtained a listing for the cathedral on the National Register of Historic Places based on the cathedral's role in state history. This designation implicates state law that further constrains alterations in and disposition of the property. Minn.Stat. § 138.665 (2000) (providing that state departments, agencies, and political subdivisions have a responsibility to protect listed properties and that state departments and agencies are required, before licensing an undertaking that will affect listed properties, to agree with the state historical society on means of mitigating adverse effects to the property).

The exterior of the cathedral is generally in good condition and consulting architects consider the building to be structurally sound, but the interior is in disrepair and there is no active heating or plumbing

---

2. Minnesota Statutes § 272.02, subd. 1, provides, in relevant part:

All property described in this section to the extent herein limited shall be exempted from taxation:

* * * *

(6) Institutions of purely public charity * * *.

Minnesota Statutes § 272.02, subd. 1(6) was renumbered in 1999 as subdivision 7. Minn.Stat. § 272.02, subd. 7 (2000).

system. Costs for necessary repairs and a heating system are estimated to be $175,000. In its August 1996 application to the Internal Revenue Service for federal tax exempt status, Skyline reported $2,600 cash on hand with which to carry out its proposed charitable activities. All revenue received had been obtained exclusively through donations, gifts, and membership fees.

In late 1996 Skyline requested and received exemption application forms from the Polk County Assessor's office.[3] Skyline submitted its application in the early months of 1997. In May 1997 the county assessor sent a letter to Skyline advising that under an oral recommendation from the state Department of Revenue,[4] Skyline was considered a nonprofit community service organization and its property was nonexempt.[5] At the next meeting of the Polk County Board of Equalization, Skyline requested reconsideration of that decision. The Board did not change the classification of Skyline's property.[6]

Skyline petitioned the tax court to review the classification of its property in March 1998. The parties stipulated to the facts and submitted cross-motions for summary judgment. The tax court found that Skyline satisfied only two of the six *North Star* factors and thus was not an institution of purely public charity. The tax court's conclusion that four of the factors were not satisfied was based on the fact that Skyline lacked evidence of actual current operations that would fulfill those criteria. The tax court reasoned that "a careful reading indicates that the exemption applies to organizations performing *current*, and not contemplated, charitable

activities." *Skyline Pres. Found. v. County of Polk,* No. C8–98–423, 2000 WL 2596, at *4 (Minn. T.C. Dec. 29, 1999). Skyline now appeals from the tax court's determination.

This court's review of tax court decisions is limited to determining whether the tax court lacked jurisdiction, whether the tax court's decision was not justified by the evidence or was not in conformity with the law, or whether the tax court committed any other error of law. Minn.Stat. § 271.10, subd. 1 (2000); *Cmty. Mem'l Home at Osakis, Minn., Inc. v. County of Douglas,* 573 N.W.2d 83, 86 (Minn.1997). We review summary judgments to determine whether there are any genuine issues of material fact and whether the lower court erred in its application of law. *A & H Vending Co. v. Comm'r of Revenue,* 608 N.W.2d 544, 546 (Minn.2000). Neither party argues that any issues of fact are in dispute, so we review only for error in the tax court's application of law. This is a question of law subject to de novo review. *Zip Sort, Inc. v. Comm'r of Revenue,* 567 N.W.2d 34, 37 (Minn.1997).

Minnesota Statutes § 272.02, subd. 1(6), exempts from taxation "[i]nstitutions of purely public charity." Because all property is presumed taxable and exemption from property tax liability is an exception to this general rule, exemptions are to be strictly construed and parties seeking exemptions bear the burden of proof. *See Am. Ass'n of Cereal Chemists v. County of Dakota,* 454 N.W.2d 912, 914 (Minn.1990).

In *North Star,* we listed six factors that guide us in deciding whether an organiza-

---

3. The property had been exempt from taxation in the years prior to its transfer to Skyline, first as church property and then as property of a purely public charity. *See* Minn.Stat. § 272.02, subds. 1(5), 1(6) (1996).

4. The Department of Revenue reiterated this opinion in writing in April 1998.

5. Minnesota Statutes § 273.13, subd. 25(d)(3) (2000), states that "Class 4c property includes: * * * real property up to a maximum of one acre of land owned by a nonprofit community service oriented organization * * *." Class 4c property is nonexempt. *Id.*

6. The resulting tax on the property, payable in 1998, by county, city, school district, and other special taxing districts was $984. The assessed value of the property was $10,000 for the building and $19,000 for the land.

tion is an institution of purely public charity:

1.  whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward;

2.  whether the entity involved is supported by donations and gifts in whole or in part;

3.  whether the recipients of the "charity" are required to pay for the assistance received in whole or in part;

4.  whether the income received from gifts and donations and charges to users produces a profit to the charitable institution;

5.  whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives;

6.  whether dividends, in form or substance, or assets upon dissolution are available to private interests.

306 Minn. at 6, 236 N.W.2d at 757.

The tax court found that Skyline's Articles of Incorporation and other evidence showed that Skyline satisfies the first and sixth factors. We agree and limit our analysis to factors two through five.

The tax court determined that Skyline failed to demonstrate compliance with factors two through five. The primary reason for this determination was that Skyline had no record of actual operation. As noted above, the tax court concluded that "the exemption applies to organizations performing *current,* and not contemplated, charitable activities." *Skyline,* 2000 WL 2596, at *4. Whether Skyline's planned services and its projected means of providing them would satisfy the *North Star* factors was, in the tax court's view, irrelevant.

We disagree with the tax court's conclusion that only an active, operating organization can qualify for tax exemption as a purely charitable institution. First, the tax court's analysis places too much weight on the use of present tense verbs in this court's articulation of the six factors in *North Star.* Rather than reflecting a determination that only evidence of actual current operations can satisfy those factors, an issue that was not before the court in *North Star,* the choice of verb tense was likely due to the fact that the organization seeking exempt status was an operating institution. *See North Star,* 306 Minn. at 3–4, 236 N.W.2d at 755–56.

Moreover, to construe *North Star* as the tax court did here would deprive the tax assessor of the discretion to exempt from taxation those fledging organizations that have not developed a track record of actual operation but whose purpose clearly is to provide services that would qualify them as purely charitable institutions and whose intended method of operation would satisfy the *North Star* factors. The evident purpose of the exemption is to foster and facilitate delivery of charitable services by private institutions by exempting them from taxation. That goal would not be well served by depriving organizations of the exemption at a time when they are likely to be in the greatest need of such tax exempt status. Although exemptions are to be strictly construed, they should not be interpreted in a manner that frustrates the very purpose of exemption.

We conclude that proof based on actual current operations is not the only method by which the *North Star* factors may be satisfied. Rather, a new organization that has not yet provided charitable services may nevertheless qualify as a purely charitable institution by demonstrating clearly that its *planned* operations are compatible with the *North Star* factors. That is not to say, however, that an organization may maintain tax exempt status indefinitely without fulfilling its charitable purpose. How long an organization should be permitted to enjoy exempt sta-

tus without actually providing services is a question not before us today because this case involves a request for exemption from an organization that had just been formed.[7] We examine the second through fifth *North Star* factors in this light.

█ The second *North Star* factor asks whether the entity is supported by donations or gifts in whole or in part. 306 Minn. at 6, 236 N.W.2d at 757. The tax court determined that Skyline is not adequately supported financially, and thus did not satisfy this factor. The tax court focused on whether the amount of funding received by Skyline is sufficient to support it, not on the extent to which the support, of whatever amount, came from donations. In contrast, our previous decisions suggest that the focus of the second factor is that the court consider whether a would-be charity receives an adequate percentage of its revenue from altruistic supporters. *Care Inst., Inc.—Maplewood v. County of Ramsey*, 576 N.W.2d 734, 739 (Minn.1998). Such an emphasis on where the money comes from, as opposed to how much is obtained, is particularly appropriate when gauging whether a nascent organization is a charitable institution, as a new entity may not have had the opportunity to find funding sufficient to fulfill its charitable goals. At the time of the decision by the county Board of Equalization, Skyline was a new organization and had received its support entirely in the form of gifts and membership fees. Skyline therefore fulfills this factor.

█ The third factor asks whether recipients of the organization's benefits are required to pay for those benefits, in whole or in part. *North Star*, 306 Minn. at 6, 236 N.W.2d at 757. This factor is intended to assess whether people will benefit from the organization's activities to an extent greater than if the organization were merely providing a service as part of the private market. *Care Inst., Inc.—Maplewood*, 576 N.W.2d at 739 (holding that payment of market rates for rent and services by residents at a health care facility supports a finding that the third factor is not satisfied); *Cmty. Mem'l Home*, 573 N.W.2d at 87 (holding that satisfaction of the third *North Star* factor requires a showing that benefits are provided free or at considerably reduced costs); *Rio Vista Non–Profit Hous. Corp. v. County of Ramsey*, 277 N.W.2d 187, 191–92 (Minn. 1979) (holding that providing a service "at considerably less than market value or cost" is relevant to whether an organization fulfills the third factor). The tax court again focused on the use of the present tense in *North Star*'s articulation of this factor concerning payment for benefits and concluded that since no one was receiving benefits from Skyline, this factor was not satisfied.

Even if we assume that no one was receiving benefits from Skyline's activities in early 1997,[8] our inquiry under this fac-

---

7. In this regard, we note that the tax court seemed to address the status of Skyline at the time of the summary judgment motions in 1999. Because the issue on review is the validity of the 1997 decision of the county denying exempt status to Skyline's property, the tax court should have focused on the facts as they existed at the time of the county's decision. Skyline's failure to make substantial progress toward implementation of its program two years later could be relevant to its tax status at that time, but not for the tax year at issue here.

8. Skyline argues that preserving the cathedral from likely demolition was a major charitable benefit to the Crookston area, and because it was provided at no cost, this act by itself would fulfill the third *North Star* factor. Preservation of historic buildings has been recognized as providing a benefit to the public. Minn.Stat. §§ 116B.01, 116B.02, subd. 4 (2000) (providing protection of Minnesota Environmental Rights Act to historical resources); *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 107–08, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (acknowledging "widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all"). Nonetheless, we do not need to determine whether an organization that has as its sole and continuing purpose the preservation of a historical building is a purely public charity.

tor is not complete. Skyline was a fledgling organization at that time, and could not be expected to provide immediately the benefits of the community center it planned for the future. For the purposes of evaluating this factor, the important fact is that there is no evidence that Skyline had any plans to charge users for the benefits it planned to provide through the community center. Skyline satisfies the third factor.

The fourth factor asks whether the organization's income produces a profit. *North Star*, 306 Minn. at 6, 236 N.W.2d at 757. The tax court determined that Skyline did not satisfy this factor because Skyline's minimal income made it impossible to determine whether Skyline would produce a profit if it had significant income.

Again, when a new organization seeks exempt status, evidence based on past and current performance is not the only way to demonstrate compliance with the required factors. At the time it was denied exempt classification, Skyline produced no profit. More importantly, Skyline's projected revenue plans were in fact designed, at best, to meet the expenses of bringing its charitable goals to fruition. In 1997 there was no evidence that Skyline had ever produced a profit, nor was there any likelihood of this occurring. Skyline satisfies the fourth factor.

The fifth factor addresses whether the beneficiaries of the charity are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is restricted has a reasonable relationship to the charitable objectives. *North Star*, 306 Minn. at 6, 236 N.W.2d at 757. The tax court found, because there were no current beneficiaries, Skyline did not satisfy this factor. This court has considered another aspect of this factor to be whether an organization's efforts "lessen[ ] the burdens of government." *White Earth Land Recovery Project v. County of Becker*, 544 N.W.2d 778, 781 (Minn.1996).

The tax court reasoned that because Skyline was not providing any benefits at the time of its decision, it could not determine whether Skyline's programs would lessen the burdens of government, and therefore this factor was not satisfied.

Instead of concluding that the lack of present beneficiaries precludes compliance with this factor, for a new organization we again look at the organization's structure and future plans. Skyline's bylaws clearly demonstrate that the community center envisioned under phase two of its plan is to be an open, inclusive institution. As concerns the subfactor of lessening governmental burdens, Skyline intends to use the community center to provide educational, recreational, and entertainment opportunities. These certainly fall within the range of services provided by governmental facilities. *Cf. North Star*, 306 Minn. at 22–24, 236 N.W.2d at 765–66 (Kelly, J., concurring specially) (noting that the Guthrie Theatre Foundation had been granted purely public charity status by the tax court); *Christian Bus. Men's Comm. of Minneapolis, Inc. v. State*, 228 Minn. 549, 560–61, 38 N.W.2d 803, 812 (1949) (holding use of property for a youth center is a purely public charitable use and a "contribution to the public good"). At the time Skyline's property was classified nonexempt, there was no evidence that Skyline had restricted or had any plans to restrict the beneficiaries of its acts. Because of this, and because Skyline's planned use of the cathedral would lessen the burden of government, we conclude that Skyline satisfies the fifth factor.

Thus we conclude that when properly viewed, based on Skyline's status as a new organization at the time of the county's denial of exempt status, Skyline satisfies the second through fifth *North Star* factors, as well as the first and sixth, which the tax court found were met. Therefore, Skyline qualified as a purely public charity and its property should have been classified as exempt in 1997.

We recognize Polk County's concern that looking to possible future use of property by a fledgling organization, as we have done in applying the *North Star* factors, may open the public charity exemption to fraud by organizations that declare charitable goals they have no intention of pursuing. It is important to recognize, though, that we do not hold that mere declaration of intent is sufficient to fulfill any of factors two through five, nor that an organization has unlimited time to turn aspirations into action. We require the entity seeking tax-exempt status to provide clear evidence of commitment to the charitable goals described, including, but not limited to, the absence of any actions contrary to such commitment. We simply recognize that a new organization may be granted a reasonable period of time in which to bring such commitment to tangible fruition.

Here, all evidence as of early 1997 points to Skyline having a fully charitable intent for the use of the cathedral. Additionally, the covenants in the deed to the cathedral received by Skyline and Skyline's Articles of Incorporation constrain the use of the property and Skyline had taken no action contrary to its eventual charitable purpose of creating a community center. Skyline had existed and held the cathedral for only a few months when the exemption was denied. It had not yet been allowed a reasonable time to accomplish its charitable goals.

We have used this forward-looking approach before:

A use of a property which merits tax exemption is a present use and not an intended future use, subject, however, to the proviso that where a corporation * * * entitled to hold its property exempt from taxation acquires property with the intention of devoting it to a tax-exempt use, the right of exemption carries with it * * * the opportunity to adapt and fit the property for use within a reasonable time in execution of plans or arrangements made for the purpose * * *. Whether due diligence has been exercised in adapting the property to a tax-exempt purpose is a question of fact to be decided according to the circumstances of each case.

*Christian Bus. Men's Comm.*, 228 Minn. at 557–58, 38 N.W.2d at 810 (citation omitted). We noted in *North Star* that the fundamental considerations underlying the six factors are whether individual profits are realized and whether the charity is a subterfuge for the accommodation of a select few. 306 Minn. at 6, 236 N.W.2d at 757. Allowing a new organization a tax exemption for a reasonable time until it can commence providing its planned charitable benefits furthers the purpose of the exemption to foster charitable enterprises and does nothing to undermine these crucial considerations where its charitable purpose is clearly demonstrated by stated objectives, organizational structure, and future plans.

We neither hold nor suggest that an organization can maintain exempt status as a purely public charity indefinitely based only on goals, plans, and projections. An organization may not merely buy and hold property and continue to maintain an exemption as a purely public charity based only on planned future use of the property where there is no evidence of efforts to bring the plans to fruition. To retain exempt status over time an organization must demonstrate progress toward implementing its plans and eventually that it is an ongoing institution of purely public charity. If it fails to do so, its property may be reclassified.

Here, the question is whether at the time of Polk County's decision to deny exempt status, Skyline, then a newly-formed organization, was clearly demonstrated to be a purely public charity under Minnesota law. We hold it was.

Reversed.