HOUSING AND REDEVELOPMENT AUTHORITY IN
AND FOR THE CITY OF MINNEAPOLIS v.
GEORGE C. FRONEY AND OTHERS.

234 N. W. 2d 894.

October 3, 1975—Nos. 45509, 45279.

*Connolly & Heffernan* and *John S. Connolly,* for appellant.
*Feinberg, Meyers, Schumacher & Schumacher* and *James J. Schumacher,* for respondent.

Heard before Rogosheske, Peterson, and Kelly, JJ., and considered and decided by the court en banc.

PER CURIAM.

One of the respondents appeals from an order of the Hennepin County District Court directing that his property be included in condemnation proceedings and that commissioners be appointed to make an appropriate award.[1] We affirm.

Appellant, George C. Froney, is the owner of a 1/9 interest and occupier of a home located at 643 Washington Street N. E., in the city of Minneapolis. In November 1966, the St. Anthony East Urban Renewal Plan was adopted by the Minneapolis City

---

[1] Appellant appealed from the order for judgment which is a nonappealable order. Upon his petition pursuant to Rule 105, Rules of Civil Appellate Procedure, we granted discretionary review.

Council, which included appellant's property within the project boundaries. However, originally appellant's property was not designated by the Minneapolis Housing and Redevelopment Authority (HRA) as one "to be acquired," or one "possibly to be acquired." The primary purpose of the renewal project is comprehensive rehabilitation of older homes, such as appellant's in the near northeast area of Minneapolis. Under the comprehensive plan, HRA encouraged appellant to undertake repairs on the home in 1968, and the record reveals that by 1970 plumbing and electrical work had been completed. In the period from 1970 to 1972, HRA requested that further extensive repairs be done at appellant's own pace, but it appears that appellant was either unwilling or unable to complete them.

On September 21, 1972, HRA modified the St. Anthony renewal plan to designate appellant's property as subject to "possible acquisition,"[2] which was approved by the Minneapolis City Coun-

---

[2] "Possible acquisition" is defined in the plan as follows: "Properties identified for 'possible acquisition' on said Map 3 are identified on the basis of their present use and condition because of apparent cost of necessary repair and/or necessity to correct the use, or land overcrowding conditions. The Housing and Redevelopment Authority in and for the City of Minneapolis will not acquire these properties providing that the owners will enter into an agreement to rehabilitate the property to substantially conform to City Codes and Ordinances, and in some cases an agreement to purchase adjacent cleared land or to permit the removal of a second dwelling structure on the lot.

"In the event the owner of any of these properties fails to enter into an agreement to make the required improvements, The Housing and Redevelopment Authority in and for the City of Minneapolis will acquire such property and will elect to either:

"(1) Demolish the structure or structures thereon or dispose of the land in accordance with the Urban Renewal Plan at its fair market value for redevelopment,

"(2) Sell the property at its fair value, subject to its being rehabilitated to meet the Rehabilitation Standards, or

"(3) Rehabilitate the property to meet the Rehabilitation Standards and to sell the property at its fair market value."

cil in December 1972. This approval followed compliance with notice of hearing and hearing requirements pursuant to Minn. St. 462.525, subd. 6.[3]

Just prior to this approval, in October 1972, HRA representatives inspected the house regarding improvements necessary to bring the house into compliance with Minneapolis health, safety, and housing ordinances. Another inspection was conducted in August 1973, after which a specific list of repairs was compiled and sent to appellant. A final inspection was made in June 1974 which revealed that no repairs had been made since the October 1972 visit or from the August 1973 list.

Due to the continuing deterioration of the house and appellant's unexplained inability to provide the needed rehabilitation, on February 26, 1974, HRA notified him of its plans to acquire the propery through condemnation proceedings,[4] which appellant challenged. Following a hearing and a personal inspection of the house, on June 27, 1974, the trial court issued its order granting HRA's petition for condemnation and appointing commissioners to determine compensation.

The only issue presented is whether there is sufficient evidence to sustain the finding by the trial judge that the property being

[3] Minn. St. 462.525, subd. 6, provides: "A redevelopment plan may be modified at any time before or after the lease or sale of the project area or parts thereof, provided the modification shall be adopted by the authority and the governing body of the political subdivision in which the project is located, upon such notice and after such public hearing as is required for the original adoption of the redevelopment plan: Provided, however, that where the authority determines the necessity of changes in an approved redevelopment plan or approved modification thereof, which changes do not alter or affect the exterior boundaries, or do not substantially alter or affect the general land uses established in such plan, such changes shall not constitute a modification of the redevelopment plan nor require approval by the governing body of the political subdivision in which the project is located."

[4] Minn. St. c. 117.

condemned was taken for a valid public purpose.[5]

It is elementary that the power of condemnation may be exercised only for a public use or purpose.[6] One of those valid purposes is the acquisition and clearing of blighted areas. The unrebutted testimony of Eugene Malis, an HRA inspector, was that needed repairs had not been completed voluntarily by appellant and, therefore, for the health and safety of the occupants, a public taking was necessary to either renovate the house or tear it down in order to eliminate the blight condition. Appellant himself admitted on direct examination that by the fall of 1973, numerous items remained to be repaired, and that none of the 1973 list of repairs had been done prior to trial. The entire tone of the testimony at the short hearing supports the HRA decision to condemn the property for a valid public purpose. In view of the great weight entitled to determinations of the condemning authority and our limited scope of review,[7] we find no abuse of discretion by the trial court. The evidence overwhelmingly supports the taking for a public purpose.

It is undisputed that HRA intends to offer the house for sale to a private party for redevelopment. This fact alone does not take away the "public" aspect so that the taking was improper. Transfer of condemned land to a private developer is incidental to the main public purpose of eliminating blighted housing. Housing and Redevelopment Authority of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. 2d 673 (1959); Asch v. Housing and Redevelopment Authority, 256 Minn. 146, 97 N. W. 2d 656 (1959); Housing & Redevel. Author. v. Coleman's Service, Inc. 281 Minn. 63, 160 N. W. 2d 266 (1968). This principle was only

---

[5] Such public taking through condemnation proceedings must be for one of the public purposes set out in Minn. St. 462.415.

[6] Asch v. Housing and Redevelopment Authority, 256 Minn. 146, 97 N. W. 2d 656 (1959); Housing and Redevelopment Authority of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. 2d 673 (1959).

[7] Housing & Redevel. Author. v. Mpls. Metropolitan Co. 259 Minn. 1, 104 N. W. 2d 864 (1960).

recently affirmed by this court in Housing & Redevelpment Authority v. Schapiro, 297 Minn. 103, 210 N. W. 2d 211 (1973), where property was acquired for redevelopment, not merely for resale to a private third party "as is."

The record is devoid of any evidence indicating that a private buyer has already been located by HRA who is merely waiting to purchase the house "as is" upon successful completion of these condemnation proceedings. Such a situation would involve use of the public authority to acquire and transfer property without the requisite public purpose of redevelopment, and has been condemned by us in Port Authority of St. Paul v. Groppoli, 295 Minn. 1, 202 N. W. 2d 371 (1972). The facts of this case, however, do not fall within the Groppoli proscription.

Appellant also contends that HRA was arbitrary and unreasonable in failing to give him personal written notice regarding the designation of his parcel as subject to "possible acquisition" in the renewal plan modification prior to city council approval on December 19, 1972. However, this argument was not made to the trial court. This court normally does not pass upon issues and contentions raised for the first time upon appeal. However, we point out that the requirements for a public hearing and prior notice are set forth in Minn. St. 462.521, subd. 1:

"Whenever an authority determines that a redevelopment project should be undertaken, it shall apply to the governing body of the municipality in which the project is located for approval thereof. The application shall be accompanied by a redevelopment plan, a statement of the method proposed for financing the project, and the written opinion of the planning agency, if there is one. *Before approving any redevelopment plan, the governing body shall hold a public hearing thereon after published notice in a newspaper of general circulation in the municipality at least once not less than ten days nor more than 30 days prior to the date of hearing.*" (Italics supplied.)

A modification of the original renewal plan requires com-

pliance with the same notice and hearing requirements. Minn. St. 462.525, subd. 6. HRA more than adequately complied with these statutory requirements. Notice of the proposed modification was published in the official publication of the City of Minneapolis, *Finance and Commerce,* on November 29, 1972, and December 6, 1972. The statute requires only one published notice. An open public hearing of the Minneapolis City Council considering the modification was held on December 13, 1972, followed by a resolution adopting it on December 19, 1972. The mayor approved the modification on December 22, 1972, and it was subsequently published in *Finance and Commerce* on January 5, 1973. Appellant's claim that personal written notice was due him finds no support in Minn. St. 462.421 and must, therefore, fall.

Affirmed.