In the Matter of the Petition of RIO VIS-TA NON–PROFIT HOUSING CORPO-RATION for Review of Objections to Real Property Taxes Payable in 1976, Appellant,

v.

COUNTY OF RAMSEY, Respondent,

State of Minnesota, Respondent.

No. 48302.

Supreme Court of Minnesota.

Feb. 23, 1979.

Doherty, Rumble & Butler and Timothy J. Halloran, St. Paul, for appellant.

William Randall, County Atty., Steven DeCoster and Thomas Poch, Asst. County Attys., St. Paul, Warren Spannaus, Atty. Gen., James W. Neher, Special Asst. Atty. Gen., Dept. of Revenue, St. Paul, for respondents.

Heard before PETERSON, TODD, and SCOTT, JJ., and considered and decided by the court en banc.

TODD, Justice.

Rio Vista Non-Profit Housing Corporation (Rio Vista) was organized for the purpose of providing low-rent housing to families of modest income. The construction costs and part of the rental income are from Federally subsidized programs. Rio Vista challenged the assessment of real estate taxes against its property. The trial court allowed the taxes, asserting that Rio Vista was not an institution of purely public charity and therefore not exempt from taxation. We reverse.

The matter was submitted to the trial court on stipulated facts, together with brief and oral testimony on behalf of Ramsey County. The transcript of the oral testimony was not furnished on appeal. Essentially, the stipulated facts disclose that

Rio Vista was incorporated in 1971 as a nonprofit corporation under Minn.St. c. 317. The purpose of the corporation was to provide low-rent housing to families of low and moderate incomes. A 48-unit complex was completed in 1972. The entire cost of construction was financed by a bank under the Federal Housing Program known as "section 236." Under this program, the Federal Government guarantees the loan and pays directly to the bank the difference between the 7-percent interest charged by the bank on the loan and the 1-percent interest on the loan charged to and paid by Rio Vista. Payments on the principal are also paid by Rio Vista.

The loan is repaid mainly through rents charged to the tenants. Under the section 236 program, Rio Vista must establish two standards of rent—(1) basic rent determined according to payments of principal on the loan and the 1-percent interest, and (2) a fair market rent determined according to the payments of principal, interest, and mortgage insurance.[1] The fair market rent is calculated according to amounts needed to repay the loan. However, tenants who satisfy the eligibility requirements of the section 236 program [2] pay an amount of rent equal to 25 percent of their income or the basic rent, whichever is greater. In no event, however, is the tenant charged more than the fair market rent. Almost all tenants at Rio Vista pay the basic rent and none are wealthy enough to pay the fair market rent.

Under a different Federal program—the Rent Supplement Program—the Federal

---

1. In 1972, the basic rents were $109 for a 1-bedroom unit and $154 for a 2-bedroom unit, and the market rents were $169 and $239, respectively. In 1975, the basic rent of the 1-bedroom unit was raised to $125, and the 2-bedroom unit was raised to $165. The market rent increased to $186 and $246, respectively. In 1976, the basic rent increased by charging the tenants for electricity.

2. To be eligible for payment of a monthly rent less than the fair market value rent established for the unit, a tenant must not have income in excess of the following amounts:

| Number of Persons in Household | Maximum Annual Income |
|---|---|
| 1 person | $ 9,600 |
| 2 persons | 11,000 |
| 3 persons | 12,400 |
| 4 persons | 13,800 |
| 5 persons | 14,700 |
| 6 persons | 15,500 |

A tenant must also qualify as one of the following: (1) Be a member of a family of two or more persons related by blood, marriage, or operation of law, who occupy the same unit; (2) a single person, 62 years of age or older; (3) physically handicapped; (4) a single person under 62 years of age, provided that no more than

Government pays, for eligible tenants, an amount equal to their basic rent minus 25 percent of their income. The net result of the rent supplement is that the eligible tenants have to expend no more than 25 percent of their income for rent. Nineteen of the 48 tenants qualify for the rent supplement.

Rio Vista paid real estate taxes on the property from 1974 to 1976 on the basis of a 20-percent assessment. The taxes in 1976 were $14,278.54. Rio Vista paid the first half of these in May 1976 and then brought an action to recover the 1976 taxes, arguing it is a tax-exempt charity.[3] The trial court disallowed the claim, asserting that Rio Vista was not an institution of purely public charity so as to qualify for a tax-exempt status as provided by Minnesota law.

The issues presented are:.

(1) Is a nonprofit corporation which provides housing under a section 236 Federally subsidized program to families of modest incomes an institution of purely public charity for purposes of Minnesota real estate taxes?

(2) Is an institution of purely public charity obligated to pay real estate taxes under Minn.St. 273.13?

1. Minnesota law provides a tax exemption to institutions of purely public charity. Minn.Const. art. 10, § 1; Minn.St. 272.02, subd. 6. There is no question that Rio Vista is liable for the tax, as determined by the trial court, if it does not qualify as a purely public charity. The Internal Revenue Service and Minnesota Department of Revenue have concluded that Rio Vista is a tax-exempt charity for the purpose of income taxation, but these determinations are not controlling on the issues before us.

Several other jurisdictions have addressed the question of whether privately operated, low-rent housing is entitled to tax-exempt status where funds or subsidies are provided by the Federal Government. These courts have not been consistent in their result or reasoning. Several courts have determined that such housing is not tax exempt because of such reasons as the significant rent paid by the tenants,[4] the donations came from the government rather than private sources,[5] and low-income housing does not further a charitable objective.[6] On the other hand, two courts have considered the tax-exempt status of section 236 housing in particular and both have concluded the housing is tax exempt.[7] A Pennsylvania court also granted tax-ex-

10 percent of the available apartments are rented to such persons; or (5) a displacee.

**3.** This action was brought under Minn.St. c. 278. For an in-depth discussion of the grounds and procedures for challenging Minnesota real property taxes, see, Note, 4 Wm. Mitchell L.Rev. 371.

**4.** In *Mountain View Homes, Inc. v. State Tax Comm'n.*, 77 N.Mex. 649, 427 P.2d 13 (1967), the court relied heavily on the fact that the tenants were charged rent in an amount sufficient to pay the cost of the project.

In *Westminister Gerontology Foundation, Inc. v. State Tax Comm'n.*, 522 S.W.2d 754 (Mo.1975), the Missouri Supreme Court concluded that the housing in question was not entitled to a tax exemption as a charity, relying heavily on the fact that significant rents were collected from the tenants. This case has since been disapproved by the Missouri court in *Franciscan Tertiary Prov. v. State Tax Comm'n.*, 566 S.W.2d 213 (Mo.1978), where the Missouri Supreme Court indicated that the case erroneously overlooked the fact that the rents had been provided at a substantial cost savings

from Federal subsidies "comparable to charitable contributions from individuals or corporations." 566 S.W.2d 223.

**5.** *Waterbury First Church Housing, Inc. v. Brown*, 170 Conn. 556, 367 A.2d 1386 (1976).

**6.** Although the Pennsylvania court had recognized in *Four Freedoms House of Philadelphia, Inc. v. Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971), that Federally assisted housing for the elderly is entitled to a tax exemption, a Pennsylvania lower court has construed that decision as restricting the exemption to housing for the elderly because housing for low and moderate income persons does not further a charitable objective. *Metropolitan Pittsburgh Nonprofit Housing Corp. v. Board of Property Assessment, Appeals and Review*, 28 Pa. (Cmwlth.) 356, 368 A.2d 837 (1977).

**7.** *Banahan v. Presbyterian Housing Corp.*, 553 S.W.2d 48 (Ky.1977); *Franciscan Tertiary Prov. v. State Tax Comm'n., supra*. These cases are virtually indistinguishable from the Rio Vista situation.

empt status to a similar housing project, even though rent was paid by the tenants because such rent was below fair market rent.[8]

The Minnesota Supreme Court has never addressed the precise issue presented in this case. Although an exhaustive definition of "charity" cannot be given, this court has adopted the following general definition (*In re Junior Achievement of Greater Minneapolis v. State*, 271 Minn. 385, 390, 135 N.W.2d 881, 885 [1965]):

> "The legal meaning of the word 'charity' has a broader significance than in common speech and has been expanded in numerous decisions. Charity is broadly defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons 'by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

Accord, *Mayo Foundation v. Commr. of Revenue*, 306 Minn. 25, 33, 236 N.W.2d 767, 771 (1975).

Recently, this court set forth six factors to be considered in determining whether the entity in question comes within this definition (*North Star Research Inst. v. County of Hennepin*, 306 Minn. 1, 6, 236 N.W.2d 754, 756 [1975]):

> " * * * (1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward; (2) whether the entity involved is supported by donations and gifts in whole or in part; (3) whether the recipients of the 'charity' are required to pay for the assistance received in whole or in part; (4) whether the income received from gifts and donations and charges to users produces a profit to the

charitable institution; (5) whether the beneficiaries of the 'charity' are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives; (6) whether dividends, in form or substance, or assets upon dissolution are available to private interests."

Accord, *Minnesota State Bar Assn. v. Commr. of Taxation*, 307 Minn. 389, 392, 240 N.W.2d 321, 323 (1976); *Mayo Foundation v. Commr. of Revenue*, 306 Minn. 34, 236 N.W.2d 772.

Applying these factors, there is little question that three of them support the conclusion that Rio Vista is a tax-exempt charity. Applying the first factor, the purpose of Rio Vista, as stated in its bylaws and articles of incorporation, is to provide housing to low and moderate income families on a nonprofit basis. Applying the fourth factor, Rio Vista has not made a profit, losing from $16,802 to $22,588 in the years 1972 through 1976. Applying the sixth factor, Rio Vista's articles of incorporation require that upon dissolution, the assets shall be disposed of in a manner that precludes any distribution to a private interest.

Application of the remaining factors presents greater difficulty. The second factor looks to the extent of support by donations. Without a doubt, the very existence of Rio Vista can be attributed to support from the Federal Government because the government guaranteed and funded in part the low-interest construction loan and it also provides a significant rent assistance. There is some question, however, of whether this factor encompasses governmental assistance as well as private donations. The trial court concluded that the donations must be private rather than public. However, at least one Minnesota case, as well as cases from other jurisdictions,[9] indicates that the donation may be from public as

---

8. *Four Freedoms House of Philadelphia, Inc. v. Philadelphia, supra.* Generally, courts are less willing to deny the tax-exempt status when the amounts paid by beneficiaries of the charity are less than cost. Annotation, 37 A.L.R.3d 1191, 1203.

9. See cases cited in footnotes 7 and 8.

well as private sources. In *In re Claim of Assembly Homes, Inc. v. Yellow Medicine County,* 273 Minn. 197, 140 N.W.2d 336 (1966), this court held that a nursing home was a tax-exempt charity even though the residents' care was paid by the county welfare boards and the Veterans Administration, as well as by private contributions.

■ We conclude that Rio Vista satisfies the requirements of the second factor. The fact that the donor is the Federal Government and not a private institution does not preclude a determination that Rio Vista is supported in part by donations.

We now turn to the fifth factor—whether the class of beneficiaries has a reasonable relationship to charitable objectives. Rio Vista argues that housing for low and moderate income families furthers a charitable objective. As demonstrated by this court's definition of "charity" set forth in *In re Junior Achievement of Greater Minneapolis v. State, supra,* this factor is intertwined with the question of whether such housing "lessens the burdens of government."

■ We conclude that housing for low and moderate income families furthers a charitable objective and lessens the burdens of government. It would be anomalous to hold that governmental objectives are not furthered by a nonprofit corporation which implements a Federally created and funded program. The trial court concluded that the burdens of government were increased from the program because Federal funds were spent. In this regard the trial court confused the second factor of "donation" with the fifth factor of "charitable objective." If private organizations did not implement these Federally assisted housing projects, presumably the government might seek to implement them through government agencies. Thus, private organization which assist the Federal Government in the implementation of these projects do promote charitable objectives and lessen the burdens of government.

Our conclusion is buttressed by decisions of this court and statements of the Minnesota Legislature. This court on several oc-

casions has stated that redevelopment and construction of dwellings under housing and redevelopment statutes has a "public purpose" in the context of eminent domain. *Housing and Redevelopment Authority v. Froney,* 305 Minn. 450, 234 N.W.2d 894 (1975); *Housing and Redevelopment Authority v. Greenman,* 255 Minn. 396, 96 N.W.2d 673 (1959); *Thomas v. Housing and Redevelopment Authority of Duluth,* 234 Minn. 221, 48 N.W.2d 175 (1951). The legislature also has declared that shortage of housing for low and moderate income families is inimical to public welfare. Minn.St. 462A.02, subd. 2. By analogy, private entities that provide housing for low and moderate income families should be deemed to further a public purpose and lessen the burdens of government.

■ The most troublesome issue is presented by the application of the third factor—whether recipients of the charity are required to pay for the assistance in whole or in part. This factor has been considered in three Minnesota cases. In *Camping & Education Foundation v. State,* 282 Minn. 245, 164 N.W.2d 369 (1969), this court denied tax-exempt status to a camp which was supported mainly through tuition, characterizing the camp as a "commercial activity." In *Madonna Towers v. Commr. of Taxation,* 283 Minn. 111, 167 N.W.2d 712 (1969), this court denied tax-exempt status to a retirement apartment complex where the basic financial plan of the project was to create the capital structure by the proceeds of a membership fee. This court denied tax-exempt status to a similar retirement apartment complex in the case of *State v. United Church Homes,* 292 Minn. 323, 195 N.W.2d 411 (1972).

The situation at Rio Vista cannot be distinguished easily from these cases. The monthly basic rents presently charged at Rio Vista are $125 for a 1-bedroom unit and $165 for a 2-bedroom unit, plus electricity. The commercial nature of the operation is also reflected in the fact that a tenant may be evicted for failure to pay rent. Further, the exhibits indicate that rents cover approximately 77 percent of the total operating costs at Rio Vista.

However, our reading of the record also indicates that much of this rent is actually paid by the Federal Government. Thus, rents actually paid by tenants are *not* the major source of revenue to the project. This is a distinguishing feature of the Rio Vista situation: Tenants receive the housing at considerably less than market value or cost. This is unlike the situation in the *Camping & Education Foundation, Madonna Towers,* and *United Church Homes* cases.

■ Considering all six factors, we conclude that Rio Vista is an institution of purely public charity. Admittedly, the question is close. The decision of the trial court is supported by a well-reasoned memorandum. Nevertheless, we conclude that Rio Vista meets the standards and definitions devised by this court for qualification as an institution of purely public charity. The fact that a purely public charity receives some remuneration from those it benefits does not deprive the institution of its charitable exemption. The *amount* of remuneration in relation to benefits conferred always require an analysis of the facts of each case.

■ 2. We find no merit to the state's contention that institutions of purely public charity lose their tax-exempt status by reason of Minn.St. 273.13, subd. 17, which provides that Title II housing for the elderly or for low and moderate income families shall be assessed at 20 percent of the market value for the purpose of real property taxes.[10] There is no question that Rio Vista's property is Title II housing. However, it is argued by Rio Vista that § 273.13 is a classification statute rather than a taxing statute, and therefore the statute has no application to tax-exempt institutions of purely public charity.

We agree. Section 273.13, subd. 1, states:

"All real and personal property *subject to a general property tax* and not subject to any gross earnings or other lieu tax is hereby classified for purposes of taxation as provided by this section." (Italics supplied.)

Giving effect to this language, the 20-percent assessment under § 273.13, subd. 17, is not applicable to tax-exempt property because such property is not "subject to a general property tax." Section 273.13 classifies property which is already subject to taxation; it does not authorize the imposition of a new tax on otherwise untaxed property.

Our conclusion is supported by other statutory provisions. Institutions of purely public charity derive their exemptions from taxation under the provisions of Minn.St. 272.02. According to the language of that section, the tax-exempt status is limited only by the provisions set forth in §§ 272.02 and 272.025. Had the legislature intended to limit or remove the tax-exempt status of charitable Title II housing, it could have provided such in § 272.02 or § 272.025. By placing the provision for a 20-percent tax on Title II housing in § 273.13, we hold that the tax-exempt status of Rio Vista is unaffected and that the 20-percent tax does not apply to tax-exempt institutions of purely public charity.

Reversed.

OTIS, J., took no part in the consideration or decision of this case.

10. Minn.St. 273.13, subd. 17, provides: "A structure situated on real property that is used for housing for the elderly or for low and moderate income families as defined by Title II of the National Housing Act or the Minnesota housing finance agency law of 1971 or regulations promulgated by the agency pursuant thereto and financed by a direct Federal loan or Federally insured loan or a loan made by the Minnesota housing finance agency pursuant to the provisions of either of said acts and acts amendatory thereof shall, for 15 years from the date of the completion of the original construction or substantial rehabilitation, or for the original term of the loan, be assessed at 20-percent of the market value thereof, provided that the fair market value as determined by the assessor is based on the normal approach to value using normal unrestricted rents."

Subd. 17a provides: "The provision of subdivision 17 shall apply only to non-profit and limited dividend entities."