CROIXDALE, INC., Relator,

v.

COUNTY OF WASHINGTON,
Respondent.

No. A06–153.

Supreme Court of Minnesota.

Jan. 25, 2007.

Paul B. Zisla, Peter A. Koller, Julia M. Dayton, Moss & Barnett, P.A., Minneapolis, MN, for Relator.

Doug Johnson, Washington County Attorney, Richard Hodsdon, Asst. Washington County Attorney, Stillwater, MN, for Respondent.

## OPINION

MEYER, Justice.

Relator Croixdale, Inc. (Croixdale) challenged respondent County of Washington's decision to remove Croixdale's real property tax exemption beginning with taxes assessed in 2003 and payable in 2004. At trial, the tax court concluded that Croixdale was not an institution of purely public charity under Minn.Stat. § 272.02 (2002) and that Croixdale was not exempt from real property taxation. On appeal, Croixdale challenged the tax court's application and analysis of the six-factor test for determining whether it qualified as an institution of purely public charity established in *North Star Research Institute v. County of Hennepin,* 306 Minn. 1, 236 N.W.2d 754 (1975), arguing that the tax court: (1) wrongly disregarded studies presented by Croixdale's experts which established that Croixdale charged less than market rent; (2) erred when analyzing Croixdale's financial statements to determine that Croixdale had made a profit; and (3) improperly concluded that Croixdale did not lessen the burden on government. We affirm the decision of the tax court because Croixdale failed to meet its burden of proof under *North Star.*

Croixdale is a 501(c)(3) nonprofit Minnesota corporation that was founded to assist seniors in the Bayport and St. Croix Valley area who are no longer able to live independently but not yet in need of 24–hour medical care. Croixdale began offering assisted living services in 1961 and independent living apartments in 1981.

By the late 1990s, Croixdale's assisted living building was nearly 40 years old, lacked the size and amenities common to newer assisted living facilities, and was

experiencing declining occupancy. Croixdale consistently operated at a loss and was dependent upon donations from its founder, Katherine Andersen, or her foundation, the Katherine B. Andersen Fund (the Andersen Fund), to cover any operating losses. In 2000, however, the Andersen Fund stopped funding Croixdale's operating losses.

Without the Andersen Fund support for its operating losses, Croixdale was forced to re-examine its future viability. After studying its options, Croixdale's board of directors decided to demolish Croixdale's existing buildings and rebuild both the assisted living and independent living units.

Rebuilding Croixdale's assisted living and independent living facilities cost approximately $18 million. This project was financed through a capital campaign. By minimizing debt, the board hoped to offer lower rents, keeping Croixdale affordable. Croixdale raised approximately $10.5 million in pledges from private donations. The remaining funds were financed through tax-exempt bonds provided by the City of Bayport. Capital campaign donations were not specifically earmarked for rebuilding either the assisted living center or the independent living apartments.

Once rebuilt, rent for the assisted living facility was increased to a break-even price. All assisted living residents pay for their housing plus base level care. Residents may purchase points of care, which equate to services, if their needs are not met at the base level. The costs of these "points" are added to the resident's monthly rent. Residents pay only for services received and do not pay for services someone else receives.

With three exceptions, all assisted living residents pay Croixdale's published rates. The three exceptions are: (1) residents of Croixdale's old building who were grandfathered into the new building at the old building's rates; (2) residents on government assistance; and (3) residents receiving Mission Benevolence funds.

In late 1999 or early 2000, Croixdale used its own assets to establish the Mission Benevolence Fund for residents with financial need. Croixdale does not actively seek donations to the Mission Benevolence Fund. Each year the fund pays out 5% of its $1.6 million of assets, or approximately $80,000, to assist residents of both the assisted living and independent living facilities.

Only current Croixdale residents may receive Mission Benevolence funds.[1] The Mission Benevolence Fund is not marketed to the public. Residents must apply for Mission Benevolence funds and provide Croixdale with detailed financial information. Before receiving funding, residents have to spend down their assets and exhaust available government assistance funds. As of November 30, 2004, eight of the assisted living center's 53 residents were receiving Mission Benevolence funds for a total of $35,568.72 in aid for the year.

Until 2003, the entire Croixdale facility, assisted living and independent living services combined, was exempt from real property tax under Minn.Stat. § 272.02 as an institution of purely public charity. In 2003, based on information provided by Croixdale, the county removed Croixdale's property tax exemption. In response, Croixdale conceded that the independent living portion of the facility was subject to real property tax but appealed the county's removal of the property tax exemption

---

1. For purposes of this opinion, Mission Benevolence funds refer to private funds distributed by Croixdale to individuals who have applied for and formally receive Mission Benevolence funding.

from the assisted living portion of its facility to the tax court.

The tax court applied the six-factor test established in *North Star* to determine:

(1) whether the stated purpose of the undertaking is to be helpful to others without immediate expectation of material reward;

(2) whether the entity involved is supported by donations and gifts in whole or in part;

(3) whether the recipients of the "charity" are required to pay for the assistance received in whole or in part;

(4) whether the income received from gifts and donations and charges to users produces a profit to the charitable institution;

(5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives;

(6) whether dividends, in form or substance, or assets upon dissolution are available to private interests.

*Croixdale, Inc. v. County of Washington,* Nos. CX–05–3068, C5–05–3043, C3–04–1720, 2005 WL 3542887 *1, *5 (Minn. T.C. Dec. 22, 2005) (citing *N. Star Research Inst.,* 306 Minn. at 6, 236 N.W.2d at 757). Based on the evidence presented, the tax court concluded that Croixdale had not met its burden of establishing *North Star* factors three, four, and five and therefore Croixdale was not an institution of purely public charity under the statute.

■ This court reviews a tax court's decision to determine whether the tax court had jurisdiction, whether or not the order is justified by evidence or in conformity with law, or whether the tax court committed an error of law. Minn.Stat. § 271.10 (2004). Absent a question of law, we will uphold the tax court's decision where sufficient evidence exists for the tax court to reasonably reach the conclusion that it did. *Care Inst., Inc.—Maplewood v. County of Ramsey,* 576 N.W.2d 734, 738 (Minn.1998); *Am. Ass'n of Cereal Chemists v. County of Dakota,* 454 N.W.2d 912, 914 (Minn.1990).

■ The Minnesota Constitution provides that "[t]axes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes, but * * * institutions of purely public charity * * * shall be exempt from taxation except as provided in this section." Minn. Const. art. X, § 1. By statute, all "[i]nstitutions of purely public charity" are exempt from real property tax. Minn. Stat. § 272.02, subd. 7.[2] All property is presumed taxable, however, and the taxpayer bears the burden of proving entitlement to an exemption. *Am. Ass'n of Cereal Chemists,* 454 N.W.2d at 914.

■ When determining whether an organization qualifies for a property tax exemption under the statute, this court defines charity as

a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons "by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or

**2.** Minnesota Statutes § 272.02, subd. 1(7) (2002), contains two exceptions to property tax exemption for institutions of purely public charity, which are not relevant to these proceedings because we have determined that Croixdale was not an institution of purely public charity for the years in question. Minnesota Statutes § 272.02, subd. 1(7), was amended in 2005, eliminating those exceptions.

otherwise lessening the burdens of government."

*Junior Achievement of Greater Minneapolis, Inc. v. State,* 271 Minn. 385, 390, 135 N.W.2d 881, 885 (1965) (citation omitted). A worthwhile objective alone does not justify classification as an institution of purely public charity. *SHARE v. Comm'r of Revenue,* 363 N.W.2d 47, 50 (Minn. 1985). In *North Star,* this court established a six-factor test to help determine whether an organization is an institution of purely public charity for the purposes of real property tax exemption. 306 Minn. at 6, 236 N.W.2d at 757. Not every *North Star* factor needs to be met to determine that an organization is a purely public charity. *Mayo Found. v. Comm'r of Revenue,* 306 Minn. 25, 36, 236 N.W.2d 767, 773 (1975). Therefore, when applying the *North Star* factors, we are mindful that the "purpose of the exemption is to foster and facilitate delivery of charitable services." *Skyline Pres. Found. v. County of Polk,* 621 N.W.2d 727, 732 (Minn.2001). The tax court must decide each case on its own facts. *Mayo Found.,* 306 Minn. at 36, 236 N.W.2d at 773.

The tax court applied the *North Star* analysis and found that Croixdale established that it met factors one, two, and six but did not meet its burden of proof in establishing factors three, four, and five.[3]

■ Before reaching the factors that the tax court applied, we first emphasize that Croixdale bears the burden of proof in establishing that it is an institution of purely public charity. At trial, Croixdale presented financial data that included both its assisted living facility, which it claimed was a institution of purely public charity, and its independent living facility, which Croixdale acknowledged was not an insti-

tution of purely public charity. Croixdale asked the tax court to assume that its debt servicing strategy, combined operating expenses, and rental fee structure ultimately established that the independent living units subsidized the assisted living facilities. But, based upon the record presented, we cannot positively conclude that Croixdale adequately established that its resources are truly allocated in such a manner. We note that we do not believe that the failure of Croixdale to meet its burden of proof bars Croixdale from challenging its tax-exempt status in future tax years. But its failure to meet its burden of proof does prevent Croixdale from obtaining property tax exemptions in 2003, 2004, and 2005.

■ Factor three examines "whether the recipients of the 'charity' are required to pay for the assistance received in whole or in part." *N. Star Research Inst.,* 306 Minn. at 6, 236 N.W.2d at 757. To prove this, we have said that the organization must prove that residents receive services at a rate " 'considerably less than market value or cost.' " *Cmty. Mem'l Home at Osakis v. County of Douglas,* 573 N.W.2d 83, 87 (Minn.1997) (quoting *Rio Vista Non–Profit Hous. Corp. v. County of Ramsey,* 277 N.W.2d 187, 192 (Minn. 1979)). We have imposed the "considerably less than market value or cost" test as a means of proving that rents were established for the stated charitable purpose rather than for purely business reasons. *See Care Inst., Inc.—Roseville v. County of Ramsey,* 612 N.W.2d 443, 449 (Minn. 2000). Because operating at a loss may be caused by any number of factors, operating at a loss is not sufficient to establish that a facility is charging less than market

---

**3.** Because only factors three, four, and five are at issue in this case, we limit our discussion to these factors.

value. *Cmty. Mem'l Home at Osakis,* 573 N.W.2d at 87. Instead, we look to see if residents are receiving services at free or reduced costs. *Id.; see also Care Inst., Inc.—Maplewood,* 576 N.W.2d at 739.

■ Although the test is stated in the alternative—market value *or* cost—in this case the tax court focused only on market value. In this situation, where testimony indicated that the variety of services and amenities provided by area assisted living centers made it difficult to compare the market value of facilities, the appropriate inquiry should have been whether Croixdale's residents paid less than cost for the services, amenities, and assistance provided to them. We find the tax court's failure to examine whether the services were provided for less than cost problematic, particularly here, where an organization has an obsolete facility and is required to build a new one in order to provide adequate services. The construction costs of a new facility, incurred at current capital costs, may be well in excess of competing facilities that were built years earlier. If the facility is to recover its capital costs over time, which it must do to stay in operation, it may not be able to charge below "market" rates when compared to organizations with older, fully depreciated facilities. Yet, its rates might be well below cost. Croixdale argues that, as a result of the capital campaign, it is able to set its rates considerably below those required to recover its capital costs. The tax court erred by failing to consider whether Croixdale's rates were below cost.

Croixdale's evidence was that the $8,600,000 received in capital contributions, if allocated equally to the 109 assisted living and independent living units, produced a savings of $11,000 per unit in construction costs and a savings in excess of $650 per month per room in debt service. If this savings was fairly allocated to each assisted living room, and if this savings was passed on to the residents of those rooms (two facts we cannot determine from this record), Croixdale would have satisfied factor three by showing that donations enabled Croixdale to charge resident fees below cost.

The tax court's failure to consider whether Croixdale's services were below "cost" penalizes Croixdale for becoming more professional and fiscally responsible. If, to be exempt, a charity must be fiscally irresponsible, not use best management practices, and depend on operating donations to constantly bridge the shortfall in its cash needs, then most exempt charities will not survive because they cannot realistically depend on perpetual operating contributions. The whole purpose of the charitable exemption, to encourage and support the societal contributions of true charities, would be defeated by requiring that they be casually managed. More specifically, a charity that improves its infrastructure and establishes break-even budgets will be one that can stabilize and maximize the care that it can provide to the residents in need. These enhancements should be seen as being supportive of, not contradictory to, the charitable mission.

■ Despite the tax court's failure to examine whether Croixdale's services were considerably below cost, we conclude that sufficient evidence supports the tax court's conclusion that factor three was not met. Testimony established that Croixdale's rents were set to allow Croixdale to break even, that Croixdale's points of care system was designed to ensure that residents paid for the services they received, and that the price for the points of care was based on the cost of staff for the amount of time that the services required. While this evidence suggests that Croixdale's services were provided at a close to cost

basis, these factors, combined with our inability to ascertain. from Croixdale's financial statements what expenses and savings can be attributed to the assisted living units, suggest that Croixdale did not sufficiently meet its burden of proof in establishing that its services were offered considerably below cost.

■ Factor four examines "whether the income received from gifts and donations and charges to users produces a profit to the charitable institution." *N. Star Research Inst.*, 306 Minn. at 6, 236 N.W.2d at 757. Recognizing that all six of the *North Star* factors need not be met in order to establish an organization as a purely public charity, modest increases in net worth, when consistent with goals of the organization, do not destroy an organization's charitable nature. *Mayo Found.*, 306 Minn. at 36–37, 236 N.W.2d at 773–74; *see Am. Ass'n of Cereal Chemists*, 454 N.W.2d at 915 (concluding that factor four was met because the profits were used to further the organization's future objectives instead of for private gain); *SHARE*, 363 N.W.2d at 51 n. 3 (noting that a 2–year increase in net worth does not eliminate nonprofit status).

■ Croixdale argues that the tax court confused positive cash flow with profit when examining its financial statements and wrongly attributed donations to profit. Factor four examines whether the income received as a whole, including donations, produces a profit for the institution. *N. Star Research Inst.*, 306 Minn. at 6, 236 N.W.2d at 757. Factor four is not intended to discourage charitable institutions from engaging in financial planning with an eye toward long-term viability. However, long-term financial planning, which could result in a modest increase in net worth, is different from producing a profit. In this case, when accounting for donations, gifts, and charges to residents,

with the exception of year one, Croixdale's financial documents showed an anticipated cash flow of $125,000 to $325,000 over five years. Based on this evidence, the tax court could reasonably conclude that Croixdale produced a profit.

■ Factor five examines "whether the beneficiaries of the 'charity' are restricted or unrestricted and, if restricted, whether the class of persons to whom the charity is made available is one having a reasonable relationship to the charitable objectives." *N. Star Research Inst.*, 306 Minn. at 6, 236 N.W.2d at 757. As a subpart of factor five, the charity must lessen the burden on government. *Cmty. Mem'l Home at Osakis*, 573 N.W.2d at 87; *Worthington Dormitory, Inc. v. Comm'r of Revenue*, 292 N.W.2d 276, 280 (Minn.1980). Both current and future activities of the organization help determine whether an organization lessens the burden on government. *White Earth Land Recovery Project v. County of Becker*, 544 N.W.2d 778, 781 (Minn.1996); *see also Care Inst., Inc.— Roseville*, 612 N.W.2d at 449 (examining whether the long-term philosophy of the charity involves providing services to the economically disadvantaged).

In this case, Croixdale disputes the tax court's conclusion that it does not lessen the burden on government. Croixdale claims that by providing its residents with financial assistance through its Mission Benevolence Fund and by reducing its residents' rent through its charitable campaign, it lessens the burden on government.

■ We are not persuaded by this argument. The Mission Benevolence Fund is available only to existing Croixdale residents, not new residents. And even then, Mission Benevolence funds are only available to residents after they have spent down their existing financial resources and

the possibility of government assistance has been exhausted. Additionally, Croixdale has offered no evidence indicating how reducing its overall rents by $650 lessens the burden on government. Based upon these facts, we conclude that Croixdale did not meet its burden of showing that it lessened the burden on government and that sufficient evidence exists to support the tax court's conclusion that Croixdale failed to meet factor five.

In summary, we conclude that sufficient evidence supports the tax court's conclusion that Croixdale is not qualified for real property tax exemption as an institution of purely public charity. In doing so, we again note an organization need not prove all six *North Star* factors to establish that it is an institution of purely public charity under Minn.Stat. § 272.02. Here, the tax court weighed these factors in relation to the particular facts and circumstances of the case, and it reasonably reached the conclusion that Croixdale did not qualify for real property tax exemption.

Affirmed.

HANSON, Justice (concurring).

Although I concur in the result, I write separately to express concerns about the continued viability of our six-factor test, especially as applied by the tax court in this case.

A. *Croixdale's Burden of Proof*

I agree with the result reached by the majority because Croixdale failed to meet its burden of proving that, in 2003, 2004, and 2005, its assisted living services were exempt from property taxes as an "institution of purely public charity." Croixdale did not meet its burden of proof because it did not adequately separate the financial information for its assisted living services, which it claimed were charitable, from that

for its independent living services, which it agreed were not charitable.

The financial data presented by Croixdale to the tax court was based on its combined financial statements for both operations. Croixdale's arguments for exemption would require us to assume that its assisted living facilities and services are essentially a microcosm of the combined operation. More specifically, we would have to assume that the combined revenues and expenses of Croixdale should be allocated to the assisted living services on some pro rata basis, presumably based on the comparative number of rooms. From the record presented, we cannot be satisfied that the fee structure for the assisted living service is the same as that for the independent living services; that the share of the combined operating expenses imposed by the assisted living services was proportional to the number of rooms; that the benefits of the donated capital, calculated by Croixdale to provide a $650 rate reduction for each room, were fairly allocated between assisted living services and independent living services on the basis of the number of rooms in each; and that the annual donations or income from the investment of past donations support the assisted living services to the same degree that they support the independent living services.

I agree with the observation of the majority that the conclusion that Croixdale did not meet its burden of proof in this record would not preclude Croixdale from seeking to reinstate tax exemption for its assisted living services in some future tax year if it is able to provide the requisite financial data, allocated specifically to those services. I would go further and conclude that, if the financial results and relationships for the assisted living services were essentially the same as those for the combined operations, I would con-

clude that Croixdale is entitled to tax exemption as an institution of purely public charity.

### B. The North Star Six–Factor Test

I am concerned that the six-factor test does not fairly determine whether an organization is one of purely public charity. And I see a significant risk that the mechanical application of that test could deny the exemption to a charity that our Constitution intended to benefit. I understand the desirability of having a multi-factor test that can give practical meaning to the broad constitutional concept of an institution of "purely public charity." But I question whether the *North Star* factors do so. In fact, I believe that at least one of those factors actually contradicts the constitutional concept.

First, I note that our decision in *North Star* draws the six factors individually from a sampling of cases, no single one of which used them in this particular combination. *See N. Star Research Inst. v. County of Hennepin,* 306 Minn. 1, 6, 236 N.W.2d 754, 756–57 (Minn.1975) (citing *Assembly Homes, Inc. v. Yellow Medicine County,* 273 Minn. 197, 140 N.W.2d 336 (1966) (nursing home); *Junior Achievement of Greater Minneapolis, Inc. v. State,* 271 Minn. 385, 135 N.W.2d 881 (1965) (youth training); *Christian Bus. Men's Comm. v. State,* 228 Minn. 549, 38 N.W.2d 803 (1949) (hospitality center); *County of Hennepin v. Grace,* 27 Minn. 503, 8 N.W. 761 (1881) (parochial school); and *County of Hennepin v. Bhd. of the Church of Gethsemane,* 27 Minn. 460, 8 N.W. 595 (1881) (hospital)). As a result, I question whether they should be applied in combination to all cases. Although this concern is mitigated somewhat by our ruling that an organization need not meet every factor,[1] that ruling provides no guid-

ance on which factors are most important, and which are unimportant, for a particular type of organization.

Second, I find that the organization for which the factors were developed in *North Star*—an organization that performed applied research on the opportunities for economic development for the benefit of private enterprises—is not the type of organization that is traditionally thought of as charitable. In *North Star* we identified traditional charitable undertakings as "care for the sick, *the aged,* and the infirm; education of young people; hospital care for the poor; facilities to promote moral and educational welfare of youth; [and] institutions for religious education." 306 Minn. at 5–6, 236 N.W.2d at 756–57. (emphasis added) (footnotes omitted). As a result, it could be argued that the six-factor test was designed to answer a different question than that presented here—how do you determine that an activity is charitable if it is not one that has traditionally been viewed as being charitable? Obviously, Croixdale's care for the aged by providing assisted living services is an activity that has traditionally been viewed as a charitable undertaking. And the facts surrounding Croixdale's development and implementation of its assisted living services program demonstrate that it deserves to be classified as a traditional charity.

Croixdale identified a significant societal need to be served. Its testimony shows that the older adult population in Washington County is expected to grow from 11,500 in 1995 to 51,000 in 2025. If the only option for older adults who are no longer able to live in their own homes is a nursing home, then the growth of the older adult population will impose serious societal and

1. *Mayo Found. v. Comm'r of Revenue,* 306    Minn. 25, 36, 236 N.W.2d 767, 773 (1975).

financial burdens and dramatic increases in the need for governmental assistance.

Croixdale's solution to this looming crisis is to offer expanded assisted living services for those who can no longer live in their own homes because of physical or mental disabilities which make them incapable of keeping up with home maintenance, cooking, taking needed medications, or even eating regularly or bathing safely. But these residents may require only limited assistance, and do not need the constant care of a nursing home. Croixdale suggests that the best strategy, for the well being and quality of life of the resident, for the social benefit of the community, and for the financial benefit of the state and local governments, is to prolong the time a person can stay in assisted living. Croixdale showed that each progressive phase—from residing at home, to assisted living, to a nursing home—becomes more costly than the last. In this context, the assisted living services provide residents with the minimum of care needed to assure a safe living environment, regular meals, medications, and personal care—which are truly charitable activities. According to Croixdale's testimony, the average age of its assisted living residents is currently 86–7, clearly a class of older adults that is deserving of charitable services.

One could conclude from *North Star* that the six-factor test is not needed or useful for an organization like Croixdale that is engaged in an activity that is traditionally seen as a charitable undertaking. In fact, *North Star* observes that "[t]he tendency of our decisions has been to sustain exemption where these traditionally 'charitable' objectives are being furthered, so long as no individual profits from ownership of the 'charity' are realized and so long as the undertaking is not a subterfuge by which the needs of a select and favored

few are accommodated." 306 Minn. at 6, 236 N.W.2d at 757.

Croixdale suggests that our analysis could end there. It argues that Croixdale is an institution of purely public charity because it performs a traditionally charitable undertaking (care of the aged), its organizational structure does not allow for its assets or profits to accrue to individuals, and the donations it receives are used for the benefit of the residents. But this analysis does not go quite far enough because of the added qualification in *North Star*—that the organization is not a "subterfuge by which the needs of a select and favored few are accommodated." This added qualification is particularly important where, as here, the persons being served are charged a fee for services, because their ability to pay may make them a "select and favored few." Further, this qualification is important where, as here, similar services are provided by for-profit businesses and the question is whether the organization is more akin to a commercial enterprise than to a charity.

In this context, the six factors identified in *North Star* do not necessarily or appropriately answer the question of whether the service is available to a select and favored few or whether the organization is more commercial than charitable. In fact, the three factors that the tax court relied on are perhaps the least relevant to those questions.

### 1. Factor Three

For the third factor—whether the recipients of the charity are required to pay for the assistance received in whole or in part, *N. Star Research Inst.*, 306 Minn. at 6, 236 N.W.2d at 757—we have identified several alternative measures, without discussing which must be satisfied in a given case. In *North Star*, we said that the "exemption was denied to [two] homes for the aged,

also a traditionally favored form of charitable activity, because the charges made to residents by the nonprofit corporations involved gave a preferred status to wealthy persons." Id. at 9, 236 N.W.2d at 758–59 (referring to *Madonna Towers v. Comm'r of Taxation*, 283 Minn. 111, 167 N.W.2d 712 (1969) (independent living services), and *State v. United Church Homes, Inc.*, 292 Minn. 323, 195 N.W.2d 411 (1972) (same)). Croixdale would satisfy this alternative measure because 90% of its residents are low income persons, 28% of whom are on government assistance, either under the elderly waiver program or the alternative care program.

In other cases, we have said that the organization must prove that residents receive services at a rate " 'considerably less than market value or cost.' " *Cmty. Mem'l Home at Osakis v. County of Douglas*, 573 N.W.2d 83, 87 (Minn.1997) (an assisted living facility) (quoting *Rio Vista Non-Profit Hous. Corp. v. County of Ramsey*, 277 N.W.2d 187, 192 (Minn.1979)). Although that test is stated in the alternative—market value *or* cost—in this case the tax court focused only on market value. If, as I conclude, "below cost" is an alternative test, the tax court erred by failing to consider it.[2]

### 2. Factor Four

Factor four—whether the income received from gifts and donations and charges to users produces a profit to the charitable institution, *N. Star Research Inst.*, 306 Minn. at 6, 236 N.W.2d at 757—is largely irrelevant and should not be applied in this case. To the extent that this factor includes income from gifts and donations, it is actually contradictory to factor two. Factor two suggests that the

more the organization is supported by donations and gifts, the more likely the organization is charitable. Factor four seems to suggest that the more the organization is supported by donations and gifts, the less likely the organization is charitable. *Id.* Because a common characteristic of a traditional charity is that it is supported by donations and gifts, and only that characteristic enables the organization to charge rates below cost, factor four should be eliminated from the *North Star* test.

Our case law has recognized that the question of "profit" is not particularly relevant to a charity, so long as the profit cannot inure to individual benefit. Thus, in *Brotherhood of the Church of Gethsemane*, one of the cases relied on in *North Star*, we said:

> That patients who are able to pay are charged for hospital services according to their ability, and that the county pays for such services rendered to those who are a legal county charge, are facts of no importance upon the question as to the character of the institution as one of purely public charity; for the fact still remains, that, notwithstanding all receipts from such sources, the hospital is established, maintained, and conducted without profit or a view to profit, and that, on the whole, it is operated at a loss, which is necessarily made up by private contributions.

27 Minn. at 462, 8 N.W. at 596. In *Assembly Homes, Inc.*, another cased relied on in *North Star*, we expressed this view even more forcefully:

> Nor does the fact that an organization claiming exemption as one of "purely public charity" operates at a profit de-

---

2. Even if we were to focus on market rents, I would conclude that Croixdale rents, being at the low end of the spectrum of rents charged by comparable facilities, were by definition below the market rent, which should be set at the median of comparable rents.

rived from charges made to its patients nullify it status as an institution of "purely public charity" if under its charter its operations are intended for the benefit of the public generally and thereunder none of such profits can be paid to stockholders or others.

273 Minn. at 203–04, 140 N.W.2d at 340.

Viewed another way, factor four can only be reconciled with factor two if factor four excludes income from gifts and donations. Factor four would then only ask whether the revenue from the fees paid by residents exceeds operating costs. Thus, in *Brotherhood of the Church of Gethsemane*, we emphasized that an organization that operates "without any profit, or view to profit, but at a loss which has to be made up by benevolent contribution, is a charity." 27 Minn. at 462, 8 N.W. at 596. Clearly, we did not mean to include contributions in determining whether the organization made a "profit." When viewed in this way, Croixdale's operations have not generated a "profit," but instead have generated operating losses, in each of the 15 historical years. And Croixdale's operations are projected to continue to generate operating losses in each of the five future years.

The tax court found that Croixdale "has consistently sustained operating losses for the past fifteen years," but "taking into account its non-operating revenues, which include donations, investment income [from past donations], and resident activities income, [Croixdale] has had a total gain during ten of the past fourteen years." *Croixdale, Inc. v. County of Washington*, Nos. CX–05–3068, C5–05–3043, C3–04–1720, 2005 WL 3542887 *1, *10 (Minn. T.C. Dec. 22, 2005). This finding is erroneous because it incorrectly includes non-operating revenue. This finding actually reinforces the proof of factor two—that is, without donations, Croixdale

would have been insolvent years ago and would have closed its doors.

For the fifteen years considered by the tax court, from 1990 through 2004, Croixdale's "loss from operations" ranged between $216,862 to $1,419,907, and totaled over $6 million. For the five years projected in Croixdale's proforma financial statements, presumably covering 2003 through 2007, Croixdale's accountants continue to project operating losses for each of the five years. In analyzing those projections, the majority mistakenly confuses "cash flow" with "profit." As the tax court noted, the proforma projects positive "cash flow" during four of these five years, but this only reflects the effect on cash flow of eliminating the significant depreciation that results from having a newly constructed facility. If depreciation is included as an expense, as is required by generally accepted accounting principles (and by prudent planning for the deterioration of the facility), Croixdale's proforma shows an operating loss for each of the five years. The relevant line from the proforma is not the "cash flow" line, which eliminates depreciation, but the "GAAP bottom line," which reports net operating income under generally accepted accounting principles. That line shows net operating losses for 2003 of $1,013,101, for 2004 of $433,337, for 2005 of $188,163, for 2006 of $83,428, and for 2007 of $23,608, totaling nearly $1,750,000.

In this connection, the tax court apparently misunderstood Croixdale's testimony concerning what subsidies it provides to its residents. The tax court minimized the support provided by the Mission Benevolence Fund and missed an important point of Croixdale's pricing structure. Croixdale explained that for its assisted living residents who are on some form of government assistance, it charges only the rent and fees that will be reimbursed by the

government, which is well below the base charges it would make to a resident who was not on government assistance. Croixdale's analysis showed that this shortfall in charges amounted to $193,000 per year. Croixdale explained that it expects to earn $80,000 from the investment of its Mission Benevolence Fund, which could be used to defray this shortfall, but that the additional shortfall of $113,000 will be absorbed by Croixdale through unfunded depreciation.[3] For example, even if the appropriate depreciation expense were $550,000, Croixdale's charges to residents would only recover $437,000 of that amount, leaving $113,000 unfunded. This is what accounts for the "GAAP bottom line" losses for all years. Essentially, Croixdale is deferring the funding of depreciation to a future period when facility replacements are required, and Croixdale is relying on its ability to do fundraising in that future period to make up for this shortfall.

Finally, even if factor four had relevance, its application would require the court to make subjective judgments about how much profit is permissible, as being consistent with the charitable mission, and how much is not permissible because it is too great. The Constitution does not provide any objective standards by which to make that judgment and neither does *North Star*.

### 3. Factor Five

Factor five—whether the beneficiaries are restricted or unrestricted, *N. Star Research Inst.*, 306 Minn. at 6, 236 N.W.2d at 757—is also difficult to apply in this case. The only restriction that Croixdale imposes on the beneficiaries it serves is that they be aged persons in need of assistance, which is a restriction that has a reasonable relationship to its charitable objectives.

Although some of our cases suggest that there is a subpart of factor five that requires that a charity "lessen the burden of government," this subpart should not require the charity to show that it somehow directly reduces government expenditures. In *North Star* we articulated a much broader view of what is involved in lessening the burdens of government:

> It can be said with respect to activities that are traditionally "charitable" that ultimately people will benefit in an economic sense from the charitable undertaking. Persons relieved from poverty and illness and the restraints of old age demand less of, and contribute more to, the economic well-being of a community than do those who are not so relieved.

306 Minn. at 7, 236 N.W.2d at 757. Providing assistance to allow aged persons to maintain a better quality of life clearly meets these broader criteria.

But even if narrower criteria were used, Croixdale did prove that its assisted living services directly reduce government expenditures. Croixdale provided testimony that if there were no assisted living facilities, the residents would need to be placed in nursing homes where they would require full medical assistance, at greatly increased costs to the government. Croixdale argued that keeping people in assisted living "as long as possible and out of nursing homes" directly reduces the costs of government.

---

3. Croixdale's discussion of the use of the income from the Mission Benevolence Fund is somewhat confusing because there was testimony that some portion of the Mission Benevolence Fund is available for the independent living residents. Also, the amounts actually distributed by the fund on behalf of assisted living residents depend on whose applications had been granted, and actually amount to about $35,000, not $80,000. But, to the extent that lesser amounts were available from the Mission Benevolence Fund, the amounts absorbed by Croixdale by not funding depreciation would be correspondingly greater.

Accordingly, if Croixdale's financial information was made specific to its assisted living operations and presented the same relative results as the combined information, I would conclude that Croixdale satisfied factors three, five, and the reformulated factor four, with the result that Croixdale would be qualified as an institution of purely public charity.

ANDERSON, G. BARRY, J., (concurring).

I join in the concurrence of Justice Hanson.